PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.

(Circuit Court of Appeals, Second Circuit. May 26, 1914.)

Nos. 273, 274, 272, 188, 189, 275.

1. STREET RAILROADS (§ 58*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

A lease of a street railroad was made subject to all debts and liabilities of the lessor, which the lessee assumed and agreed to pay, except such as were due to itself, and including all bonds which should be issued by the lessor under a certain mortgage, some of which it was provided should be issued for the benefit of the lessee in payment of the cost of reconstructing and changing the motive power of certain parts of the road, which work had begun. By a further provision the lessee was authorized, if it should deem it expedient, to change the motive power on other parts of the road, and for the amount so expended it was to receive bonds of the lessor secured by a mortgage subordinate in lien to the first mortgage and to the rents reserved. Prior to the insolvency of the lessee and the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

consequent termination of the lease it had changed the motive power on certain parts of the lines, but had not demanded nor received the bonds to which it was entitled therefor. *Held*, that as between the parties the indebtedness so created was a part of that assumed by the lessee, and that on an accounting between them it was not entitled to charge the amount against the lessor.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

**2.** STREET RAILROADS (§ 49*)—LEASE—SECOND LEASE BY LESSEE—EFFECT AS ASSIGNMENT OF ORIGINAL LEASE.

A street railroad company, whose franchise had less than 100 years to run, leased its road, the lease to continue in force during all extensions of its charter. Subsequently the lessee leased its entire system, including such leased lines, to another company for 999 years. *Held*, that although at the time of the making of the original lease the law permitted an extension of charters in perpetuity, it could not be said that the lessor's charter would be extended beyond the term of the second lease; that, the reversionary right of the lessor therein being wholly uncertain, the second lease operated as an assignment of the first, and the second lessee was primarily liable by privity of estate to the owner of the property for any damages proved resulting from its failure to keep the road and equipment in repair, and to pay taxes and assessments, as required by the terms of the original lease, during the time it was in possession.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

**3.** STREET RAILROADS (§ 58*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

Bonds of a street railroad company, payment of which was expressly assumed by a long-term lessee, and which matured prior to the termination of the lease by reason of the insolvency of the lessee, *held*, as between the parties, basis for a provable claim against its estate.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

**4.** STREET RAILROADS (§ 58*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

A lease of a street railroad provided that whenever the lessee deemed it expedient it might change the motive power in use at its own expense. It was further provided that in case it made such change on its request the lessor should issue and deliver to it mortgage bonds for the amount of the expenditure, but the lessee expressly assumed payment of such bonds. It made and paid for the change to electric power, but made no request for the issue of bonds therefor, and some eight years afterward the lease was terminated by reason of its insolvency. *Held*, that on an accounting between the parties it was not entitled to set off, against claims owing to the lessor for breaches of the lease, the amount expended by it in making the change of power.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

**5.** STREET RAILROADS (§ 58*)—INSOLVENCY—CONTRACT WITH EXPRESS COMPANY—DAMAGES FOR BREACH.

The owner of a street railroad system entered into a contract with an express company, by which it granted to the latter the exclusive right of doing express business over its system for 20 years, including main lines, branches, and leased and controlled lines, so far as it could lawfully do so, and agreed to supply and operate the cars for that purpose in consideration of 20 per cent. of the gross profits of the business. The contract provided that it should bind the successors, assigns, lessees, and transferees of the parties. The railroad company through stock ownership

procured the execution of similar contracts with the express company by its controlled lines. It afterward leased its system by a lease which operated as an assignment of the contract during the continuance of the lease, but subject to its termination for breach of condition. Later the express company assigned the contract to another company, including also the other separate contracts, in consideration of an annual payment of $10,-000. The lessee performed the contract until by reason of its insolvency the lease was terminated, and thereafter its receivers and those of the lessor, which was also insolvent, continued to perform for some months, and then declined to adopt it and discontinued operation of the express cars. Thereupon the express company's assignee terminated its contract as provided therein. *Held,* that the railroad lessee was bound by the contract only until the termination of its lease, and, the contract having been performed until after that time, was not further liable, but that the lessor, as a party thereto, was liable to the express company for the value of the contract to the end of the term if the same could be proved; that the amount the express company received annually from its assignee, while evidence of such value, was not the sole measure, and that further evidence that such assignee while operating thereunder for three years earned an average net profit of $30,000 a year was competent and sufficient to warrant the allowance to the express company of substantial damages.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 135; Dec. Dig. § 58.*]

**6.** RECEIVERS (§ 158*)—CLAIMS ENTITLED TO PREFERENCE.

To justify the giving of a preference to claims for supplies against the estate of an insolvent railroad company, the supplies furnished must have been of such quantity and to be paid for at such times as to indicate that they were necessary for current operation and were to be paid for out of current earnings, but direct evidence as to the latter condition is not necessary, as the court may draw the inference that such was the expectation of the parties from the circumstances attending the transaction.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

**7.** RECEIVERS (§ 158*)—CLAIMS ENTITLED TO PREFERENCE.

Claims for supplies furnished for the use of a street railroad company within a reasonable time prior to the appointment of receivers in insolvency for such company, of which claims for sand used to facilitate the starting and stopping of cars, for globes, burners, and wicks used in the operation of horse cars and for track work, for lubricants used on cars and in power houses, and for coal used in power houses are types, *held* properly given preference over claims of general creditors out of current earnings or unmortgaged assets in the hands of receivers.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

**8.** RECEIVERS (§ 163*)—PREFERRED CLAIMS—INTEREST.

Supply claims against the estate of an insolvent railroad company which are given a preference over the claims of general creditors out of a certain fund are entitled to interest after the appointment of receivers, where the fund is sufficient to pay all such claims in full with interest.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 312–316; Dec. Dig. § 163.*]

**9.** RECEIVERS (§ 158*)—CLAIMS ENTITLED TO PREFERENCE.

Tort claims against an insolvent street railroad company for injuries to individuals through negligence in operation are not for operating expenses in such sense as to entitle them to preference over claims of general cred-

itors, nor are claims for rental of leased lines, nor by a city for the cost of paving.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

**10. RECEIVERS (§ 158*)—DISTRIBUTION OF ASSETS.**

The fact that an insolvent lessee of a street railroad system was controlled by its lessor and caused to apply its earnings to the payment of dividend rentals to the lessor's stockholders, which payments, although preferential, were of a valid indebtedness, does not deprive the receivers of the lessor, which is also insolvent, of the right to share equally with other general creditors of the lessee in respect to a proved claim for rent.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Pennsylvania Steel Company and The Degnon Contracting Company against the New York City Railway Company and the Metropolitan Street Railway Company. Appeals from four decrees arising out of the receivership. Affirmed.

For opinions below, see 208 Fed. 168, 747, 757, and 777.

W. H. Page, of New York City, for Metropolitan Express Co.

Arthur H. Masten, of New York City, for Metropolitan St. Ry. Co., receiver.

M. C. Fleming, of New York City, for New York City Ry. Co., receiver.

Brainerd Tolles and Julien T. Davies, both of New York City, for Second Avenue Ry. Co.

C. T. Payne, of New York City, for Farmers' Loan & Trust Co.

Chase Mellen, of New York City, for the Central Park N. & E. R. R. Co., receiver.

J. R. Abney, of New York City, for Latta and others, tort creditors.

B. S. Catchings, of New York City, for Accident Creditors' Committee.

G. N. Hamlin, of New York City, for Contract Creditors' Committee.

C. H. Tuttle, of New York City, for Cornell and others.

C. M. Travis, of New York City, for Pennsylvania Steel Co. and another.

R. R. Rogers, of New York City, for the New York Rys. Co.

Before COXE, WARD, and ROGERS, Circuit Judges.

WARD, Circuit Judge. We are about to decide four appeals arising out of the receivership in the above case.

Mr. Turner, the special master, and Judge Lacombe have written so fully in respect to the questions involved that it will not be profitable to go over the ground again; our conclusions being addressed to counsel thoroughly familiar with all the facts and all the authorities.

It will be convenient to begin by stating certain of our findings which are material in most of the cases once for all, so as to avoid unnecessary repetition.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

We have decided in the Termination of Lease Proceeding, Pennsylvania Steel Co. v. N. Y. City Ry. Co., 198 Fed. 721, 725, 117 C. C. A. 503, that Messrs. Joline and Robinson, who were appointed receivers of the New York City Railway Company September 24, 1907, and of the Metropolitan Street Railway Company October 1, 1907, were really acting for the Metropolitan Company from September 24, 1907. This was upon the principle that the City Company had no interest to continue a losing lease, whereas the Metropolitan Company, as owner, was deeply interested in the continuance of the system as a going concern. Therefore between the two estates the Metropolitan Company was liable for everything done by the receivers.

We also held that this fact did not determine when the Metropolitan City lease actually terminated, and that this would depend upon the right and fact of re-entry. Although the lease was referred to in several decisions as having certainly terminated on or before dates named, the actual date was never determined until the special master fixed it as of October 1, 1907. The dual receivership caused the uncertainty. Separate receivers were not appointed until July 31, 1908. If different persons had been originally appointed receivers of each company there could have been no doubt as to the date when the lease terminated. Judge Lacombe's primary purpose from the beginning was to preserve the system of transportation as a going concern for the benefit of the public and by appointing the same persons as receivers of both companies he secured greater harmony and economy of operation. However, as both companies, when hopelessly insolvent, voluntarily put themselves in the hands of the court, and after September 24, 1907, never had possession, custody or control of the premises, there could not have been any actual re-entry by the Metropolitan Company. We think what was done amounted to a surrender of the lease by the City Company September 24, 1907, and an acceptance of the surrender by the Metropolitan Company October 1, 1907. Therefore we agree with the special master as to the date.

There was a paramount necessity at the beginning of the receivership to raise funds, which could only be done by the issuance of receivers' certificates. Although the District Court originally, and this court at first upon appeal, attempted to marshal the assets for the payment of these certificates, it was ultimately concluded that to give them greater marketability they should be made a first lien upon all the property of both companies; the question as to which estate they should be paid from being reserved to the final distribution. Pennsylvania Steel Co. v. N. Y. City Ry. Co., 163 Fed. 242, 246, 90 C. C. A. 188.

One other consideration is to be noted. In the Express Company's appeal, 198 Fed. 735, 117 C. C. A. 503, we departed from the New York rule that only matured claims existing on the date receivers are appointed are provable. This rule has the advantage of absolute simplicity. Still, we thought it very inequitable that claims which were ascertainable at the time they were required to be presented should be excluded. Of course some day must be fixed, and fixed by the District Court, so as not to delay distribution. In this case he did fix the time before which all claims must be filed against the City Company as December 10, 1907, and against the Metropolitan Company as January 15,

1908. It is true that he did this when every one concerned understood that no claims were provable except those which were ascertained and matured at the date of the receivership, in accordance with the New York rule. By pure inadvertence he signed an order in some of the cases permitting claims to be filed of a later date, without inserting the usual provision that they should be filed nunc pro tunc as of the dates already fixed. This he very properly corrected when it was called to his attention. It is said that in accordance with the views we expressed in the case of the Express Company's appeal, 198 Fed. 735, 117 C. C. A. 503, he ought to have fixed much later dates than December 10, 1907, and January 15, 1908. But he has not been willing to change these dates. If his action is a subject of review by us, we are not at all willing to disturb it. No one knew better than he the necessities of this very complicated and perplexing receivership, throughout which he has exhibited an anxious disposition to deal fairly with every interest. We are entirely satisfied to rest upon his conclusion in this respect.

The subsidiary lessors of lines to the Metropolitan Company were in a position to re-enter their properties whenever default was made, but did not do so. They acquiesced in the operation of their lines by the receivers until the receivers returned them. The termination of these leases is therefore fixed at those dates respectively. During the period of experimental operation the receivers operated these lines for the benefit of the lessors; they being entitled to the net profits, if any, and obliged to bear the deficiency, if any. Termination of Lease Proceeding, 198 Fed. 725.

I. Appeal of Second Avenue Railroad Company et al. For opinions of the special master and the District Court, see Pennsylvania Steel Co. v. N. Y. City Ry. Co., 208 Fed. 757.

This case involves claims against both the estate of the Metropolitan Company and the estate of the City Company arising out of the lease of the Second Avenue line, dated January 28, 1898, to the Metropolitan Company, which was included in the lease by the Metropolitan Company of its property to the City Company for 999 years from April 1, 1902. The Second Avenue Company had made a mortgage dated January 20, 1898, to secure an intended issue of bonds in the sum of $7,-000,000 to take up certain outstanding bonds and for electrification of the line. The receivers never adopted this lease, but returned the premises to the Second Avenue Company November 12, 1908, at which time the lease terminated.

The District Court made an order February 1, 1910, allowing the Second Avenue Company, the Guaranty Trust Company, trustee of the $7,000,000 mortgage, and the receiver who had been appointed by the state court in an action to foreclose that mortgage, to file their claims against the Metropolitan Company and the City Company on or before March 1, 1910, which he subsequently amended, so as to make them filed nunc pro tunc as of December 10, 1907, against the city estate and January 15, 1908, against the Metropolitan estate. When we decided the Second Avenue bondholders' appeal, 198 Fed. 747, this amendment had not been made.

[1] The court below held that the Metropolitan estate was entitled to set off advances of $740,836.21 for the improvements for which it

was authorized to call upon the Second Avenue Company to issue bonds subsequent to the $7,000,000 First Consolidated bonds. This was on the theory that the Metropolitan Company did not assume payment of bonds to be issued at its request by the Second Avenue Company and secured on its property for the purpose of raising money to pay for permanent improvements. We cannot agree to this. The question depends of course upon the construction of the language used in the lease as follows:

"Whereas, the party of the first part heretofore obtained the approval of the State Board of Railroad Commissioners to a change of motive power on parts of said railroad from horse power to electric power, which change has been consented to by the owners of more than one-half of the property bounded on that portion of the railroad on which said change of motive power is proposed, and has entered into contracts for the reconstruction of its roadbed, rendered necessary by such change, and has incurred large debts and liabilities therefor, and is now largely indebted to the party of the second part for money paid upon such contracts, or advanced for the purpose of making such construction; and whereas, for the purpose of paying or refunding prior bonded indebtedness and for the additional purpose of paying the debts incurred in such reconstruction, and for carrying out the contracts entered into for the building, finishing and operating of the said electric lines of railroad, and providing equipment therefor, and for other lawful purposes of the corporation, the party of the first part has heretofore determined to issue and dispose of its bonds to the amount of seven millions of dollars, and to secure the payment thereof by a mortgage upon its said railroad, and all its real estate, property, right and franchises of every kind and description; and whereas, the party of the first part with the consent of more than two-thirds of its stockholders, has heretofore executed and delivered to the Guaranty Trust Company of New York a mortgage as aforesaid to secure the payment of its said bonds to the amounts aforesaid; and whereas, none of said bonds have been issued or disposed of, but are all as yet to be issued and disposed of for the purposes aforesaid:

"It is further agreed that the party of the first part will forthwith, in accordance with the terms and conditions of said mortgage, issue and dispose of its said bonds to an amount sufficient to pay and discharge all its debts and obligations and contracts heretofore incurred in the reconstruction of its road and roadbed made necessary by the change in its motive power, and will from the proceeds of such bonds pay and discharge all such debts, obligations and contracts, including the debt now due or hereafter to grow due for such purposes, to the party of the second part.

"And that it will hereafter at the demand and upon the request of the party of the second part issue and dispose of or cause to be issued and disposed of by the trustee named in said mortgage, and the proceeds paid over to the party of the second part, sufficient of its bonds to supply suitable cars, rolling stock, equipment and motive power to its said railroad to enable the party of the second part to operate the railroad hereby leased and demised by the underground system of electricity or by any other motive power, and to repay any expenditures made by the party of the second part in improving the leased property or in erecting, changing or reconstructing any building or buildings thereon, and whenever the party of the second part shall desire and determine to change the motive power upon parts or portions of the said railroad upon which changes have not heretofore been authorized or proposed, that the party of the first part will issue and dispose of and pay over the proceeds thereof to the party of the second part, or deliver to the party of the second part, or cause the trustee named in said mortgage to sell and dispose of and pay over the proceeds thereof to the party of the second part or deliver to the party of the second part the balance of its said bonds secured to be paid by the mortgage aforesaid, or so much thereof as is or will be necessary for a change of motive power and a reconstruction of its road and roadbed made necessary thereby, and to supply the necessary cars, rolling stock, equipment

and motive power thereof to enable the party of the second part to operate said road as reconstructed.

"Whenever it shall be deemed by the party of the second part expedient to extend the line or lines of the railroad hereby demised or to acquire additional real estate or construct additional buildings for the operation of said railroad, or to change the motive power upon said railroad, then upon the request of the party of the second part the party of the first part shall authorize, execute and deliver to the party of the second part the negotiable bonds of the party of the first part in the usual form for the amounts, the expenditure of which shall be required for such extension, acquisition, construction or change, and upon the like request of the party of the second part, shall secure such bonds by a mortgage or mortgages upon all its property and franchises, but such bonds when issued shall be applied solely to betterments for which the same are issued.

"This lease is made subject to all debts and liabilities of the party of the first part, except debts due or liabilities incurred to the party of the second part, and such debts and liabilities, except as aforesaid, and subject to the provisions and conditions of this lease, are hereby assumed and are to be paid by the party of the second part as a part of the consideration hereof, and all bonds that shall be issued by the party of the first part under the mortgage to the Guaranty Trust Company hereinbefore referred to, when issued or disposed of as hereinbefore provided, or as provided in said mortgage or in this lease, shall be included among the obligations which the party of the second part assumes and agrees to pay under the provisions of this lease."

The court below thought that the assumption by the lessee of all debts of the lessor (except those due to itself) applied only to existing debts, merely because the lease went on to provide expressly that the $7,000,000 First Consolidated Mortgage bonds were to be included. We think, however, that the assumption of all debts and liabilities (except those to the lessee), made after the enumeration of debts both existing and future, included the future debts. If not, there being no other provision on the subject, the lessor would be liable, not only for the principal of the bonds when due, but for the interest in the meantime. It is out of the question that the parties intended the lessor to pay interest for, say, 999 years. The fact that the lessee always did pay it until default shows this, as does also the provision elsewhere in the lease that any lien created on the premises by a mortgage to secure such bonds should be subsequent to the payment of the stipulated rent, which would be quite useless if the Second Avenue Company were intended to pay the interest.

It is said that this court in Farmers' Loan & Trust Co. v. Central Park North & East River R. R. Co., 193 Fed. 963, 113 C. C. A. 591, and Second Avenue Bondholders' Appeal, 198 Fed. 750, 117 C. C. A. 560, has held that such an assumption clause amounts only to a guaranty that the mortgaged premises shall pay the debt, and, this having been paid, there is no further liability on the Metropolitan Company. But these were not controversies between the lessor and the lessee. Both claims were by bondholders and the former was a foreclosure suit in which the bondholders were looking to the land. The opinion of the court in that case expressly reserved the question of the ultimate liability for the debt of the lessee between lessor and lessee, saying:

"This case does not require decision of the question whether the lease of 1892 imposed upon the Metropolitan Company the obligation of ultimately paying, not only the current indebtedness, but the already existing funded debt of the Central Park Company."

216 F.—30

The concurring opinion was to the effect that between the Second Avenue Company and the Metropolitan estate the latter is the principal debtor. If bonds were to be issued for these advances they would have to be presently payable in view of the insolvency of the Second Avenue Railroad, and the Metropolitan Company would be liable to pay them. Therefore we think it was not entitled to use this advance as a set-off against the Second Avenue Company's claim. For the principal of the indebtedness of the First Consolidated bonds, $7,000,000, and future interest, however, there can be no claim, because it was a contingent liability both on December 10, 1907, and January 15, 1908, there having been no foreclosure, and also because the parties expressed the liability of the Metropolitan Company, whatever it was, in the form of a guaranty printed on each bond taking effect in 1948, 198 Fed. 751, 117 C. C. A. 560.

[2] The District Court held that the Metropolitan City lease did not amount to an assignment of the Second Avenue lease to the City Company. We think it did. The charter of the Second Avenue Company had less than 100 years to run when the lease was made to the Metropolitan Company. Although the lease did provide that it was to continue during all extensions of the charter and at the time the lease was made the law permitted extensions in perpetuity, no one can say that the charter will be extended beyond 999 years, the term of the lease to the City Company. It is quite uncertain whether there will be any reversion in the Metropolitan Company. We think that the City Company is to be regarded as assignee of the lease of the Second Avenue Company and as such liable by virtue of privity of estate for any damages proved, resulting from the failure to keep the road and equipment in repair, as well as to pay taxes and assessments from April 1, 1902, to October 1, 1907, when the Metropolitan City lease terminated. The Metropolitan estate remains liable on the company's covenants notwithstanding the assignment, but between the two estates the city estate is primarily liable. The decree of the court below is to be modified in accordance with this opinion.

II. Claim of the Central Park, North and East River Railroad Company. For the opinions of the special master and the District Court, see 208 Fed. 777.

The receivers returned this line to the claimant August 6, 1908, at which date the lease terminated. The District Court allowed the claim to be filed on or before March 1, 1910, nunc pro tunc as of December 10, 1907, against the city estate and as of January 15, 1908, against the Metropolitan estate.

[3, 4] The Metropolitan Company expressly assumed the payment of the claimant's issue of $1,200,000 of bonds which fell due December 1, 1902, and, not having been extended, became, as between lessor and lessee, a matured obligation provable January 15, 1908, within our decision in the claim of the Metropolitan Express Company, 198 Fed. 735, 117 C. C. A. 503. We think this claim should have been allowed against its estate. The set-off of $861,792.37 expended by the Metropolitan Company in electrification should not be allowed, because it had expressly assumed the payment of the claimant's bonds if issued to pay

therefor. This is in accordance with our holding in the claim of the Second Avenue Railroad Company.

For the reasons stated in that case we think that the City Company was the assignee of this lease, and is, because of privity of estate, liable for failure to keep the road and equipment in repair and to pay all taxes and assessments between April 1, 1902, and October 1, 1907. As modified in these respects the order is affirmed.

III. Claim of the Metropolitan Express Company. For opinions of the Special Master and the District Court, see 208 Fed. 747.

[5] March 4, 1901, the Metropolitan Street Railway Company entered into a contract with the Metropolitan Express Company, whereby it gave the latter the exclusive right of doing express business over its system for 20 years, and agreed to supply and operate the cars for that purpose in consideration of 20 per cent. of the gross earnings of the business. The contract provided that it should "bind the successors, assigns, lessees and transferees of the parties respectively." The evident intention of the parties was to authorize the Railway Company to lease its system together with the contract, and the Express Company to assign the contract without prejudice to its provisions, and so that the lessee and the assignee should be bound as were the original parties. February 14, 1902, the Metropolitan Street Railway Company did lease its system to the New York City Railway Company. July 15, 1904, the Metropolitan Express Company assigned the contract to the American Express Company in consideration of an annual payment of $10,000 in equal quarterly installments on the 15th days of October, January, April, and July, with the stipulation, among others:

"It is further expressly understood and agreed that if at any time during the term hereby demised, the party of the second part, its successors or assigns, in the operation of the business and property hereby transferred, shall from any cause other than its own negligence or its own default in observing the conditions of said contract with said Metropolitan Street Railway Company, be excluded from the full use and enjoyment of the trackage rights and other benefits and advantages provided for in said contract, then and in such event, at the option of the said party of the second part, its successors or assigns, the term hereby demised shall cease and determine, and the party of the second part shall in such event and upon the exercise of such option, be relieved and discharged from all further liability, claims or demands hereunder."

It assigned at the same time similar contracts which had been entered into with it by four independent lines which were controlled by the Metropolitan Street Railway Company and composed a part of the Metropolitan system. Under these contracts the car equipment was to be furnished by the Metropolitan Street Railway Company. The Railway Company obtained these contracts to be executed by means of its stock control of the four companies. The New York City Railway Company and the American Express Company continued to carry out the contract until September 24, 1907, when both the City Railway Company and the Metropolitan Street Railway Company became insolvent and unable to perform it further. The receivers continued to carry it out, but on February 28, 1908, notified the American Express Company that they considered it unadvisable to adopt the contract and would discontinue operation of the express cars on and after March 15.

March 13, 1908, the American Express Company, under the option given it in the contract of July 15, 1904, notified the Metropolitan Express Company that, because deprived of the "full use and enjoyment of the trackage rights and other benefits and advantages provided for in the contract," on and after March 15th it would treat the contract as at an end as of that date.

These contracts are sometimes loosely described as leases, which they were not, being merely licenses with mutual covenants without any privity of estate between the Express Company and the Railway Company.

The same claim having been rejected in the court below as a contingent demand was heretofore before us, and we then sent it back to permit the claimant to recover nominal damages and substantial damages, if it could prove them. Pennsylvania Steel Co. v. New York City Railway Co., 198 Fed. 735, 117 C. C. A. 503. The special master reported that the average annual profit of the American Express Company was some $30,000 and that the damage sustained by the Metropolitan Express Company was $10,000 a year for the balance of the term or $129,-704.32, of which the New York City Railway Company should pay $192.31, the proportion of that sum for the week between September 24 and October 1, 1907, when receivers of the Metropolitan Street Railway Company were appointed, the balance to be paid by the latter company. He also reported that the surviving contracts with the four controlled companies were merely incidental, and ceased to have any substantial value after the system was disintegrated.

The contract was for the express privilege over the whole Metropolitan System. It passed to the New York City Railway Company, lessee, and bound it so long as it remained lessee. It is quite incredible that the parties intended to require any one not in control of the system to furnish the express privilege and operate the cars over it. Therefore, when the City Company ceased to be lessee October 1, 1907, it ceased to be liable and the lessor to the Metropolitan Express Company continued to be liable to it, the American Express Company, assignee, having withdrawn. As the receivers refused to adopt the contract, the Metropolitan Street Railway Company became liable as of October 1, 1907, when it went into the hands of the receivers, to the Metropolitan Express Company, because its insolvency disenabled it to perform the contract. Its liability was for the value of the contract to the end of the term if the Metropolitan Express Company could prove it. That we think was ascertainable on recognized principles. Damages sustained in the shape of profits prevented would evidently be the measure. The District Court said:

"Testimony was introduced tending to show that for some time before receivership the latter company made a profit out of its operation of about $30,000 a year. There is some criticism as to the sufficiency of this testimony —being in part averages and estimates—but courts are usually liberal when absolute accuracy in such matters is inherently impossible. Upon this evidence the special master has held that the contract was actually worth $10,-000 a year for the unexpired term of nearly 13 years. The difficulty with the calculation lies in its assumption that the $10,000 a year which the American Company agreed to pay was wholly for this contract of March 4, 1901. That consideration, however, was for the assignment not only of this but also of

many other contracts and leases. As to some of these the master has found that they were of no substantial value; but there are others which were undoubtedly of substantial value. As we have seen, the contract of March 4, 1901, covered not only lines owned by the Metropolitan Railway Company, but all 'controlled' lines. Among such lines controlled through stock ownership were the Union Railway, Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway, Yonkers Railroad, Southern Boulevard Railroad, Westchester Electric Railroad, and Tarrytown, White Plains & Mamaroneck Railway. The contract of March 4, 1901, contained no covenant that this control of these railroads should continue in the Metropolitan. It may be that while such control still existed the Metropolitan might have been compelled to secure from each of the companies thus controlled a concession to the express company similar to the one it had itself given; but if it parted with the control of either of them it would be powerless to obtain such concession for the express company. To that extent the value of the original contract would shrink and, there being no covenant for a continuance of control, the express company could maintain no claim for damages for such shrinkage. Whether or not the American Company would have agreed to pay $10,000 or $10 a year for the original contract does not appear. Before it took its assignments the weak point in that contract was covered; the controlled companies enumerated above had each of them made an independent contract with the Metropolitan Express Company similar in its terms to the contract of 1901. Thereafter the holder of *all these contracts* was secured in the use, for express purposes for the period named, of all the lines which the Metropolitan owned or controlled when the first contract was made. All these later contracts were included with the original one in the assignment to the American Company. The master has not found that these were 'of no substantial value'; that they were, some of them at least, of substantial value must be apparent to any one who is familiar with the intricacies of the street railway system in Manhattan and the Bronx. There was no apportionment of the $10,000 among the several parcels covered by the assignment, and there is nothing in proof by which such apportionment could possibly be made. It seems to me, therefore, impossible to determine what sum of money would fairly represent the damages resulting from the breach of this contract, which stipulated for no continuance of control. For the breaches of their several contracts the roads formerly controlled by the Metropolitan may or may not be responsible, but the finding of substantial damages against the last-named road is not confirmed."

We think the District Court erred in treating the contract between the Metropolitan Express Company and the American Express Company as the sole measure of the value of the contract between the Metropolitan Street Railway Company and the Metropolitan Express Company. If this be so, it might well result that the Metropolitan Express Company could not prove against the Metropolitan Street Railway Company the actual amount of damages that it sustained because there is no way of apportioning the annual payment of $10,000 between business over the lost lines and business over the four controlled lines which survive. But the contract with the American Express Company, though evidence of value, was not the only measure. In view of the fact that it made, excluding this payment of $10,000, some $40,000 a year, the master was well justified in finding that the value of the contract was at least $10,000 a year. There is nothing to indicate that the license, if properly exercised by the licensee, would not have continued to be very valuable. We think there is every reason to infer exactly the contrary. There can in the nature of things be no absolute proof as to damages in the way of future profits. Even if the contracts with the four controlled companies which survive have some value, as the District Court

holds, that circumstance is no defense to the Metropolitan Company. The contract was for the whole system, and when the Metropolitan line dropped out the whole purpose of the contract was frustrated by its default.

It is suggested as a reason why the contract might not continue to be profitable, that the right of the Ninth Avenue line to do express business is doubtful and that certain spurs between the tracks and express stations owned by the Express Company had been constructed without proper authority and might be removed. We are satisfied with the special master's disposition of these objections. The decree is reversed, and the court below directed to dismiss the claim as to the New York City Railway Company and to enter a decree in favor of the claimant for the sum of $129,704.32 against the Metropolitan Street Railway Company.

IV. Claim of Various Creditors for Preference, Called the Preference Proceeding. For opinions of the special master and the District Court, see 208 Fed. 168.

This cause raises questions as to how the estates of the Metropolitan Street Railway Company and the New York City Railway Company shall be distributed among creditors. Claims of preference in the assets over general creditors are made on behalf of: (1) Supply creditors of the City Company; (2) tort creditors of the City Company; (3) claims of the Metropolitan Company as lessor of the City Company and of various companies as lessors of the Metropolitan Company for breach of leases; (4) claims of the city of New York for paving.

Four supply claims have been selected as types of all the supply creditors who claim a preference, as follows: (a) Hugh Thomas, for sand used to facilitate the starting and stopping of the cars; (b) Smith Company of New York for globes, burners, and wicks used in the operation of horse cars and upon trackwork. (c) Haggerty Company, for lubricants and dynamo oil used in the operation of cars and of power houses; (d) Berwind White Coal Company, for coal used in operation of power houses.

None of the preference claimants asserts an actual lien on anything. The diligence of counsel has referred us to a multitude of decisions, which show that the courts have differed greatly: (a) As to what claims accruing against a railroad corporation shortly before a receivership should be allowed a preference; (b) upon what grounds the preference should be allowed; (c) out of what property the preference should be paid. The most striking example of the uncertainty which surrounds the whole subject is the last utterance of the Supreme Court in Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, the majority of the court holding that one who supplied a railroad company with ties immediately before a receivership which the receiver used to replace rotten ties, and which were admitted to be necessary to maintain the railroad as a going concern, was not, in the absence of any diversion of income, entitled to be paid out of the corpus of the property to the prejudice of the mortgagee, while three justices, dissenting, held that he was.

It is to be noted that in all the cases on the subject the contest was between preferred claimants and mortgagees; there being no other

property than the corpus of the estate out of which any preference could be made good. In the present case, however, the City Company has a large amount of assets not covered by mortgages or any other lien.

[6, 7] Judge Lacombe allowed the preference claimed by the four typical supply creditors on the ground of public policy, viz., that those who furnish supplies necessary for the daily maintenance of a railroad as a going concern are entitled to be first paid out of the company's unmortgaged assets. What are such supplies it is, of course, for the court to determine. He recognized it as a condition that the creditors shall not have relied merely on the personal credit of the company. They must be of such a quantity and to be paid for at such times as to indicate that they are necessary for current operations and are to be met out of current earnings. Direct evidence as to the latter condition is not necessary. The court may draw the inference that this was the expectation of the parties from the circumstances attending the transaction, Virginia & Alabama Coal Co. v. Central Railroad Co., 170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068; Southern Railway Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458. We think he was quite justified in holding that the four type claims in this case were of such a character and were furnished to the Railway Company with such an expectation for use upon its system, which included some independent, but controlled, lines. If the preference is properly rested on public policy we do not see how it can be restricted to current earnings. Such claimants should be preferred over all general creditors, and if current earnings are not sufficient to secure the preference it should be extended to the company's unmortgaged assets. The current debt fund so often mentioned in the cases is spoken of in connection with the company's mortgaged property and to justify displacement of the mortgage lien upon the corpus of the estate to the extent that the current earnings have been diverted to the advantage of the mortgagee. Where, as in this case, there are unmortgaged assets of the company, they should be resorted to first.

[8] The allowance of interest on these claims after the appointment of receivers was refused on the ground that the delay thereafter was that of the court, for which neither the debtor nor the other creditors of the debtor should suffer. In Thomas v. Railroad Co., 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663, this was said to be the general rule. In that case interest on a debt incurred during the receivership was refused as against the mortgagee out of the corpus of the estate. On the other hand, in Southern Railway Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458, the court, without saying anything on the subject in the opinion, did allow interest as against the mortgagee on the ground of a diversion of income. The point was raised in argument and was decided. We presume that the court did not intend to overrule its prior decision in Thomas v. Railroad Co., but found the particular case not to be within the general rule there laid down. As between creditors of the same class there would be no use in allowing interest out of a fund insufficient to pay all. In this case, however, the supply creditors are preferred and the fund is sufficient to pay them in full, with interest, and leave a balance over for general creditors. We are disposed to think that the ground on which

interest was allowed in the Southern Railway Case was that the mortgagee, having enjoyed the use of the diverted income, should restore it with interest. The opinion lately handed down by the Supreme Court in American Iron & Steel Manufacturing Co. v. Seaboard Air Line Railway, 233 U. S. 261, 34 Sup. Ct. 502, 58 L. Ed. 949, sets the question at rest. Lamar, J., said:

"In the discussion as to the answer which should be given that question, the Railway Company insists that, whether treated as part of the debt or allowed as damages, interest can only be charged against the railway because of delay due to its own fault, while here the failure to pay was due to the act of the law in taking its property into custody and operating the same by receivers in order to prevent the disruption of a great public utility. And it is true, as held in Tredeger Co. v. Seaboard Ry., 183 Fed. 290 [105 C. C. A. 501], that as a general rule, after property of an insolvent is in custodia legis, interest thereafter accruing is not allowed on debts payable out of the fund realized by a sale of the property. But that is not because the claims had lost their interest-bearing quality during that period, but is a necessary and enforced rule of distribution, due to the fact that in case of receiverships the assets are generally insufficient to pay debts in full. If all claims were of equal dignity and all bore the same rate of interest, from the date of the receivership to the date of final distribution, it would be immaterial whether the dividend was calculated on the basis of the principal alone or of principal and interest combined. But some of the debts might carry a high rate and some a low rate, and hence inequality would result in the payment of interest which accrued during the delay incident to collecting and distributing the funds. As this delay was the act of the law, no one should thereby gain an advantage or suffer a loss. For that and like reasons, in case funds are not sufficient to pay claims of equal dignity, the distribution is made only on the basis of the principal of the debt. But that rule did not prevent the running of interest during the receivership; and if as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid. Even in bankruptcy, and in the face of the argument that the debtor's liability on the debt and its incidents terminated at the date of adjudication and as a fixed liability was transferred to the fund, it has been held, in the rare instances where the assets ultimately proved sufficient for the purpose, that creditors were entitled to interest accruing after adjudication. 2 Blackstone's Comm. 488; cf. Johnson v. Norris, 190 Fed. 460 (5) [111 C. C. A. 291].

"The principle is not limited to cases of technical bankruptcy, where the assets ultimately prove sufficient to pay all debts in full, but principal as well as interest, accruing during a receivership, is paid on debts of the highest dignity, even though what remains is not sufficient to pay claims of a lower rank in full. Central Co. v. Condon, 67 Fed. 84 [14 C. C. A. 314]; Richmond etc., Co. v. Richmond R. Co., 68 Fed. 116 [15 C. C. A. 289, 34 L. R. A. 625]; First National Bank v. Ewing, 103 Fed. 190 [43 C. C. A. 150]."

As the preferred creditors of the City Company will be paid in full out of the assets of that company, there is no occasion to inquire whether they might have, under any circumstances, a right against the estate of the Metropolitan Company.

[9] Creditors who have recovered damages against the City Company for injuries or death resulting from negligence in operation of the road do not, in our opinion, fall within the foregoing principle on which a preference has been allowed to supply creditors. Such claims may be included in operating expenses for the purpose of ascertaining net income for dividend purposes or for determining the amount of the special franchise tax, but the claimants in no way con-

tributed to the maintenance of the railroad as a going concern. On the contrary, their claims increased the difficulties of doing so.

Similarly claims for rent are not entitled to any preference. They were clearly founded on the personal credit of the company long before insolvency, to be enforced by the right of re-entry, should such necessity arise.

The claim of the city of New York for paving is an involuntary liability of the City Company for general preservation and not for daily maintenance. We do not think it entitled to any preference.

[10] The only inquiry left is that of the right of the Metropolitan Company to share equally with the general creditors. The law of the state of New York permitted the Metropolitan Company to lease its property to the City Company. The instrument was valid. If the Metropolitan Company subsequently controlled the City Company and caused it to apply its earnings to pay dividend rentals to the Metropolitan Company's stockholders, such payment, even if preferential, was entirely lawful as a payment of a bona fide indebtedness. Both companies are now insolvent, and if upon any principle of equity they could be treated as one corporation, then the most that could possibly be said would be that the general creditors of each should share equally in the assets of both. Nothing will ever reach the stockholders of the Metropolitan Company, who are said to have received preferential payments, and it would be, in our opinion, highly inequitable to postpone the claims of its bona fide creditors to those of the creditors of the City Company.

In view of the foregoing, other questions passed upon by the special master and affirmed pro forma by the District Court need not be considered.

The decree, modified as to interest on the preferred claims, is affirmed.