PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.
(five cases).

SECOND AVE. R. CO. v. ROBINSON.

(Circuit Court of Appeals, Second Circuit. July 2, 1915.)

No. 317.

1. RAILROADS ☞206—RECEIVERS—APPOINTMENT—VACATION.

An order appointing the receivers of a railroad company to be receivers in a foreclosure suit under a mortgage given by such company does not vacate the original appointment of the receivers.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 676–682; Dec. Dig. ☞206.]

2. RAILROADS ☞208—LEASES—TERMINATION.

Where the receivers of a leased railroad do not pay the stipulated rent therefor, the lessor may ask the court that they return the property leased.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 685–691; Dec. Dig. ☞208.]

3. STREET RAILROADS · ☞49—LEASES—TERMINATION OF LEASE—RETURN OF PROPERTY—DEPRECIATION.

Where a lease of railroad property was terminated and the property returned to the lessor, it was error for a special master to determine the value of motors and cars by fixing their cost price and deducting 5 per cent. for 10 years from such price, where the average age of such motors was 6 and not 10 years, and the deduction for depreciation should have been made each year on the depreciated value, and not on the original price.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. ☞49.]

Appeal from the District Court of the United States for the Southern District of New York.

John W. Griggs, of New York City, for appellants.

Masten & Nichols, of New York City (Arthur H. Masten and William M. Chadbourne, both of New York City, of counsel), for receiver of Metropolitan St. Ry. Co.

B. S. Catchings, of New York City, for the tort creditors.

Strong & Mellen, of New York City, for Second Ave. R. Co.

Before COXE, WARD, and ROGERS, Circuit Judges.

WARD, Circuit Judge. This is an appeal by the Second Avenue Railroad Company and George W. Linch, its receiver, from an order of Judge Lacombe, dated April 27, 1915 confirming the revised report of W. L. Turner as special master, and has been for the convenience of counsel divided into two proceedings called:

(1) The Use and Occupation Proceeding.
(2) The Motors Proceeding.

## 1. Use and Occupation Proceeding.

February 1, 1897, the Metropolitan Street Railway Company executed a mortgage to the Guaranty Trust Company as trustee to secure

the payment of bonds aggregating $12,500,000. January 14, 1898, the Second Avenue Railroad Company leased its property to the Metropolitan Company. March 21, 1902, the Metropolitan Company executed a mortgage to the Morton Trust Company as trustee, which covered the foregoing lease, to secure payment of bonds aggregating $16,604,000. February 14, 1902, the Metropolitan Company leased all its property to the New York City Railway Company for 999 years from April 1, 1902. September 24, 1907, Adrian H. Joline and Douglas Robinson were appointed receivers of the New York City Railway Company, and October 1, 1907, the receivership was extended to the property of the Metropolitan Street Railway Company, its lessor. November 19, 1907, the same persons were appointed receivers in a suit to foreclose the mortgage of the Metropolitan Company to the Morton Trust Company. March 17, 1908, the same persons were appointed receivers in a suit to foreclose the mortgage of the Metropolitan Company to the Guaranty Trust Company.

[1] In this long and complicated proceeding it is impossible for the special master, the District Court, or this court to keep in mind every claim, order, and decision that has been made. Hence there may arise from time to time inconsistencies of expression of which it is easy to make too much. The paramount intention, however, to administer the property of these insolvent companies primarily for the benefit of the public by maintaining the operation of the system, and secondarily for preserving the interests of all concerned in accordance with their respective rights and priorities is unmistakable. The order appointing the original receivers to be receivers in the foreclosure suit under the mortgage to the Morton Trust Company did not vacate the original appointment, and we do not think that after November 19, 1907, they operated, as the appellants contend, for the exclusive benefit of the mortgagee.

When we held in the Termination of Lease Proceeding, 198 Fed. 725, 117 C. C. A. 503, and in Penna. Steel Co. v. New York City Railway Co., 216 Fed. 463, 132 C. C. A. 518, that in receivership cases the lessor of a subsidiary line could demand of the court the return of its property in case of default in payment of the stipulated rent, but that so long as it permitted receivers who had not adopted the lease to operate they did so for its benefit and at its risk, we were speaking generally and following Park v. New York, Lake Erie & Western R. R. Co. (C. C.) 57 Fed. 799, New York, Penna. & Ohio R. R. Co. v. New York, L. E. & W. R. R. Co. (C. C.) 58 Fed. 268, Quincy, etc., R. R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632, and U. S. Trust Co. v. Wabash, etc., R. R. Co., 150 U. S. 287, 14 Sup. Ct. 86, 37 L. Ed. 1085.

The appellants seek to distinguish the present case from the Wabash, but like it the receivership was not under a bill to foreclose a mortgage, but at the suit of a general creditor, seeking to preserve the transportation system of the insolvent railway companies for the benefit of the public and of all parties in interest. While the corporation did itself not file the bill, it consented to the relief prayed for, which consent had the same effect as did the bringing of the suit by the corporation in the Wabash Case. We cannot agree that there is any

material difference between this case and the Wabash Cases. Nor do we think that there is any inconsistency between the Wabash Cases and the earlier case of Sunflower Co. v. Wilson, 142 U. S. 313, 12 Sup. Ct. 235, 35 L. Ed. 1025, so much relied upon by the appellants. In it the net earnings involved was unpaid freight owed by the Sunflower Company to the receivers of the Railroad Company more than sufficient to pay the stipulated rent of cars due by the Railroad Company to the Sunflower Company. The court held that the Sunflower Company, lessor, need pay to the receivers only the balance over the amount due to it for rent of the cars. In other words, the receivers of the Railroad Company must pay the stipulated rent, and, having done so, were entitled to recover the surplus due to them for freight. Substantially the operation was for net earnings up to the amount of the rent. Read in connection with the facts of the case, the decision is inapplicable to the case in hand or to the subsequent decisions of the Supreme Court in the Wabash Case.

[2] If receivers do not pay the stipulated rent of a leased road, the lessor may ask the court that they return it, and in view of this fact a receiver who has not adopted the lease, but wishes to remain in possession, may prefer to pay as the value of the use and occupation a sum equal to the stipulated rent, though under no greater duty than to pay the net earnings of operation. The general rule is, of course, subject to such and other exceptions. We had not in mind a case like the one under consideration, where receivers, having paid to the lessor, not net earnings, but a sum equal to the stipulated rent, subsequently finding this to be more than the net earnings, had asked to have such payments treated only as on account. The question referred to the special master was:

"What amounts, if any, the New York City receivers and the Metropolitan receivers should pay over to the Second Avenue receiver and the Second Avenue Company on account of net income from the operation of the property of the Second Avenue Railroad Company, after deducting all proper charges against such net income."

The rent payable under the lease to the Second Avenue Company was 9 per cent. on its capital stock, consisting of 18,620 shares, of the par value of $100 each, together with all taxes, assessments, and charges lawfully imposed on the demised premises. The receivers, though not adopting the lease, no doubt to prevent any reclamation by the lessor, did pay the Second Avenue Company sums equal to the stipulated rent at the due dates as follows:

| | | |
|---|---|---|
| Oct. 31, 1907. | Six months' interest on general consolidated mortgage bonds of Second Avenue Company | $ 32,000 |
| Nov. 29, 1907. | Quarterly rental on stock of Second Avenue Company | 41,895 |
| Dec. 31, 1907. | Six months' interest on debenture bonds of Second Avenue Company | 2,225 |
| Jan. 28, 1908. | Six months' interest on first consolidated mortgage bonds of Second Avenue Company | 140,775 |
| Feb. 28, 1908. | Quarterly rental on stock of Second Avenue Company | 41,895 |
| Apr. 29, 1908. | Six months' interest on general consolidated mortgage bonds of Second Avenue Company | 32,000 |
| Total | | $290,790 |

They also paid the special franchise tax for 1907, amounting to $36,756.98.

May 31st the first change in this course of business took place, when the receivers declined to pay the moneys necessary to make up the full amount due for that quarter. After some ineffectual negotiation the Guaranty Trust Company brought suit in the state court to foreclose a mortgage of the Second Avenue Company to it as trustee, dated January 20, 1898, to secure payment of its first consolidated mortgage bonds, amounting to $5,631,000. October 9th George W. Linch, having been appointed receiver in the foreclosure suit, demanded the return of the premises, and the receivers surrendered the same to him at midnight between November 12th and 13th.

The special master held that the receivers, having voluntarily paid sums equal to the stipulated rent down to the quarter beginning March 1, 1908, could not recover the same, but on and after that date were liable only for net earnings. On the other hand, the judge of the District Court held that they operated for net earnings only during the whole period from September 24, 1907, to November 13, 1908, and directed the special master to state an account, charging them with gross earnings and crediting them with expenses of operation during that period. So long as the Second Avenue Company was receiving sums equal to the stipulated rent, it naturally would not, and indeed could not, demand a return of its premises. We think the conclusion of the judge of the District Court unfair to the Second Avenue Company, because it cannot restore the status quo of the date of September 24, 1907, and give the company the option of asking for the return of its property from the receivers in case they operated for net earnings only. As they did actually pay the sum of $32,000 May 1, 1908, on account of the quarter's rent ending May 31st, we think the master should have gone further than he did, and have held that the receivers were to be charged with net earnings only from June 1 to November 13, 1908. The account may be restated on this principle.

## 2. The Motors Proceeding.

The questions to be considered in this proceeding were referred by the District Court to the special master as follows:

(1) "Whether the Metropolitan receivers are under obligation to deliver to the Second Avenue receiver other motors and connections than those attached to the said 275 cars at the time of their delivery, and, if so, on what terms said motors and connections should be delivered, or the value thereof should be accounted for, by the said Metropolitan receivers?"

(7) "What are the rights, if any, of the receiver of the New York City Railway Company and of the Metropolitan receivers by reason of moneys expended subsequent to their appointment in putting the First Avenue Line of the Second Avenue Company between 59th street and 125th street in fit condition to run, and by reason of their expenditure of other moneys in and about the property of the Second Avenue Company?"

This is not, as counsel for appellants contend, a case of conversion by the receivers of the G. E. 57 motors, or one for punitive damages. October 9, 1908, Linch, the receiver of the Second Avenue Company, filed his petition for a return of the property. On the same day the receivers of the Metropolitan Company filed their answer, in which

they admitted liability to return, among other things, 275 double truck Brill cars equipped with G. E. 1000 motors, as set forth in Schedule D. November 5th the court entered an order directing the receiver to turn over, among other things:

"(3) The electric cars, 275 in number, described in Schedule D annexed to said answer. Said cars are to be accepted by the second Avenue receiver as constituting all the cars purchased with the funds of the Second Avenue as set forth in paragraph 7 of the petition herein, except as hereinafter provided."

On this state of facts, we think the receivers were justified in removing the G. E. 57 motors, and in holding them until the rights of both parties in respect to them had been determined. This must have been the understanding of the parties. The result has unfortunately been very prejudicial to the Second Avenue Company.

[3] Before the master proof was offered of the value of the G. E. 57 motors as of November 12–13, 1908, when they were removed by the receivers of the Metropolitan Company—first, by the usual calculation of deducting an annual percentage for depreciation; second, by proof of what such motors were worth in the market. In his first report the master fixed their value by relying especially on a calculation of depreciation for 10 years' use. Upon exceptions the judge of the District Court directed him to fix their value as of September 24, 1907, when they went into the possession of the receivers. Thereupon the master reported that the motors were put on the cars between 1900 and 1902, and that their value as of September 24, 1907, was $156,750. This value, as we understand it, was arrived at by fixing their cost price at $570 each and deducting 5 per cent. for 10 years from the original price. But the average age of the motors in September, 1907, was 6 years, and not 10 years, and the deduction for depreciation should have been made each year on the depreciated value, and not upon the original price.

There can be in the nature of things no market value for second-hand articles, because there is no standard for fixing their condition. At all events, there was no evidence in this case of market value of the G. E. 57 motors in September, 1907. Therefore, notwithstanding that both parties seem to abandon it, we think the proper way of arriving at the value of the motors is to fix their original price at $570 each and deduct the usual percentage of 5 per cent. for depreciation each year from the depreciated value for 6 years. The order of the court below may be modified to express the value in this way.

The Second Avenue lease contained the following provision as to the return of personal property in case the lease should become inoperative:

"The party of the second part also covenants and agrees that it will at the termination of this lease, or when for any cause it may cease to be operative, transfer, deliver, and return to the party of the first part in good condition the horses, harnesses, cars, tools, implements, machinery, equipments stable, equipments, office furniture and fixtures, and all property of every kind leased to and used by the party of the second part in the maintenance and operation of the railroad and railroads aforesaid, except that which is hereby absolutely transferred, or which has passed from existence by death or destruction, and shall also deliver the substitutes, increments, and additions provided or made

by the party of the second part; and the substitutes for the property impossible to deliver by reason of death or destruction shall be equal in value to that for which they are substituted. * * *"

We agree with Judge Lacombe that the Second Avenue Company was not entitled to have both the general G. E. 57 motors and the G. E. 1000 motors, but only the G. E. 57 motors, and must account for the value of the G. E. 1000 motors·delivered to it by the receivers of the Metropolitan Company. They did not add these G. E. 57 motors to the property of the company, but substituted them for the G. E. 1000 motors, which had proved insufficient for the double truck cars, and used the latter throughout the system generally.

The receivers of the Metropolitan Company expended on the Second Avenue line, to keep it a going concern, $290,179.70, as follows:

(1) To complete the electrification of the First Avenue line which is
   a part of the Second Avenue property......................$173,682.43
(2) Remodeling of the First Avenue section of the 96th street car
   house after the fire........................................ 84,110.48
(3) Clearing away the débris of the car house..................... 32,386.79
                                                     ————————

   Total .......................................................$290,179.70

These expenditures were necessary for the primary purpose of keeping the system in a condition to perform its duty to the public and were a permanent betterment of the property of the Second Avenue Company.

The decision in the Breach of Lease Proceeding, 216 Fed. 463–466, 132 C. C. A. 518, was between lessor and lessee, and does not apply to the receivers, who did not adopt and are not bound by the lease.

The ninth conclusion of law of the revised report of the special master, as modified by the first article of the order appealed from, must be further modified by calculating the value of the G. E. 57 motors in the way hereinbefore directed. With this modification, and the modification relating to the net earnings, the order is affirmed.