MARGARETTA M. FLANAGIN, by her next friend WIL-
LIAM J. FLANAGIN *vs.* SAMUEL HAMBLETON, Trustee,
and THE EASTON NATIONAL BANK OF MARYLAND.

*Question whether a Discounted note was a Renewal of a previ-
ous note—The question of Payment or renewal one of inten-
tion—Effect of the Assignment of a Bond secured by Mort-
gage, made by a Wife to her Husband, for the purpose of
enabling him to raise money thereon, as affecting the rights
of a party with whom they were deposited by the Husband as
collateral security for a loan—Estoppel.*

In 1872, a married woman endorsed in blank a mortgage in her favor,
and the bond secured thereby, and delivered them to F. her hus-
band, for the purpose of enabling him to raise money on them.
The E. N. Bank agreed with F. to lend him the money he desired,
on his note with two other joint makers, and the deposit of the
bond and mortgage as collateral security. The required note was
given in favor of the Bank, payable at a Bank in Philadelphia, six
months after date, and was discounted by the E. N. Bank for F.,
who deposited the bond and mortgage with the Bank, as collateral
security. As attorney in fact for his wife, F. assigned the mort-
gage formally on the record to the E. N. Bank, and on the original
mortgage over the signature of the wife was written an assignment
to the Bank of the mortgage and mortgage debt. When the note
was about to mature, the Bank, at the request of F., agreed to
renew it with the same makers, the Bank to retain the same col-
laterals; but as a preliminary to the renewal, and as an additional
condition of it, the Bank required that F. should procure the old
note from the Bank in Philadelphia, and bring it to the E. N.
Bank. This was done, and the new note was given, and dis-
counted, and like the first was made payable in Philadelphia. At
the end of every six months thereafter the note was renewed and
the collaterals retained, until the month of March, 1876, when the
note laid over unpaid. Each renewal after the first one recited the
fact of its being a renewal, and also recited the fact that the col-
laterals were held by the Bank as security for the payment of the
note. During all this time the Bank held possession of the bond

Flanagin *vs.* Hambleton, &c.

and mortgage, without any denial of its right of possession under the arrangement with F. The mortgaged property was subsequently sold under a prior mortgage, and the balance of the proceeds of sale, after payment of the prior mortgage, was audited to the E. N. Bank in payment of its claim. On exception to the auditor's report by the wife of F., upon the ground that the taking up of the first note by F. in Philadelphia was a payment of it, and that the arrangement for a renewal, and the subsequent discounting by the Bank of a new note, pursuant to agreement, did not make the new note a renewal, and that consequently the collaterals were released, it was HELD:

1st. That whether a new note takes the place of the old, and cancels it, or the old note is actually paid and a new note is discounted for the amount of it, in either case it is a renewal, if a renewal is intended. It is the intention of the parties and their understanding of it which makes it a renewal.

2nd. That the transaction in this case was a renewal, so as to entitle the Bank to the benefit of the collaterals deposited as security for the first note.

3rd. That the debt was not in point of fact paid, and was not intended to be *paid* by what was done respecting the note in Philadelphia.

4th. That the Bank in Philadelphia was the agent of the E. N. Bank, and payment there would have the same, but no greater effect, than if it had been paid directly to the E. N. Bank, and had been handed immediately back under the agreement for renewal, in which case there would be no question about its being a renewal.

5th. That the assignment of the bond for any purpose carried with it the mortgage which was its incident, and the power of F. over the bond after its assignment to him by his wife was absolute, and gave him the right to pledge it to the Bank as security for the note discounted for him, and to agree that the collaterals should remain as security for the renewals also.

6th. That the facts showed that the wife had actual as well as constructive knowledge of the transactions between her husband and the Bank, and her conduct and admissions touching the matter concluded her from setting up any claim as against the Bank, which had been induced to lend its money on the faith of the collaterals which she had put it in the power of her husband to treat as his own, and confessedly to raise money on.

APPEAL from the Circuit Court for Talbot County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BOWIE, BRENT, GRASON, MILLER, ALVEY and IRVING, J.

*A. P. Jump,* for the appellant.

*John H. Handy,* for the appellee.

IRVING, J., delivered the opinion of the Court.

The question, for decision in this case, arises upon the auditor's reports distributing the proceeds of sale of certain real estate made under a decree of the Circuit Court for Talbot County, sitting in equity. In the appeal of *Mary J. Johnson vs. Samuel Hambleton, Trustee, et al.,* 52 *Md.,* 378, the same point, which is made now, was made as an objection to the ratification of the sale, which was then under review, but was not regarded by the Court as essential to the proper decision of the question there presented, and was not, therefore, decided. In pursuance of the decree of this Court the sale was ratified, and this contest is on the right to the balance of the purchase money in the hands of the trustee after paying the first liens. At the hearing all other objections were waived, except the one affecting the right of the Easton Bank to claim the fund as against the appellant. The appellant claims the fund as the mortgagee of the land. The appellee claims on the ground that appellant's mortgage, and the bond which the mortgage secured, were assigned to the Bank as collateral security for a certain note of the appellant's husband and others, which has not been paid, and will not be paid, (even in part) unless these collaterals are liable for it. The record, in

the former case has, by agreement, been made a part of the record in this, and from the proofs there detailed, we learn that the appellant's husband, James S. Flanagin, in December, 1872, applied to the Easton National Bank for a loan. The appellant had certain mortgages, including the one now in controversy. For the purpose of enabling her husband to raise money on them, she endorsed the bonds and mortgages in her own handwriting in blank, and handed them to her husband, James S. Flanagin. Not desiring to buy the bonds and mortgages outright, the Bank agreed with James S. Flanagin, that it would loan him the money he desired, on his note and two other joint makers who were named, and the deposit of the bond and mortgage in question, as collateral security for the payment of the note. This was agreed upon; and a note for seven thousand dollars, payable six months after date, to the President and Directors of the Easton National Bank, payable at the National Bank of North America, Philadelphia, was drawn, dated the sixteenth of December, 1872, and was signed by James S. Flanagin, R. D. Johnson and H. Thompson. This note was discounted for James S. Flanagin, and he deposited the bond and mortgage with the Bank, and as attorney in fact, for his wife, assigned the mortgage formally on the record to the Easton Bank, and on the original mortgage, over the signature of Mrs. Flanagin, was written an assignment to the Bank of the mortgage and mortgage debt. Shortly before this note became due, Flanagin requested the same should be renewed with the same makers, and the retention of the same collaterals. His request was agreed to, but as a preliminary to the renewal, and as an additional condition of it, the Bank required that James S. Flanagin should procure the note from the Bank in Philadelphia, and bring it to the Easton Bank, and when so brought, the renewal would be completed. This was done.

The last day of grace on the note, was the 19th of June, 1872. On the 23rd day of June, the renewal note was discounted, and the collaterals, already described, were, pursuant to the agreement, retained by the Bank as security for the new note, which was signed by the same makers, and was made payable, as the first, in Philadelphia. At the end of every six months thereafter, the note was renewed, and the collaterals retained until the month of March, 1876, when the note laid over unpaid. All the renewals, after the first one, recited the fact of its being a renewal, and also recited the fact, that the collaterals, now in controversy, were held by the Bank, as security for the payment of the note.

The Bank has always retained possession of the bond and mortgage, since the making of the first note, as collateral security for the payment of it, and the successive renewals, without any denial of their right of possession, under the arrangement with James S. Flanagin, until the exceptions to the audit.

The appellant insisted before the Court below, and insists here, that the taking up of the first note by James S. Flanagin, in Philadelphia, was a payment of it; and that the arrangement for a renewal, and the subsequent discounting by the Bank of the new note, pursuant to agreement, did not make the new note a renewal; and that consequently the collaterals were released—that thereafter the Bank had no claim on them, and, therefore, the audit allowing the Bank the fund applicable to that bond and mortgage was erroneous. If the appellant's proposition was sound, under the peculiar facts of this case, still it would not *necessarily* control the decision of the case; for the whole question of the effect of the conduct of the appellant with reference to these collaterals, under the influence of which the Bank has acted in first discounting and then in its renewal, would still be open.

But does the rule as it has been laid down by appellant's counsel reach so far as to prevent the transaction in this

case being regarded by a Court of equity as a renewal? There can be no doubt, that ordinarily, the effect of a renewal is to pay the old note, even though the old note remains in the bank untaken up and uncancelled in fact, as is often the case. It is merely a dispensing with the actual payment of the money and taking up or cancelling the old note, and the immediate loan of the same money to the borrower. It is so regarded for the purpose of carrying into effect the intentions of the parties to the transaction. 2 *Parsons on Bills and Notes*, 203; *U. S. Bank vs. Georgia*, 10 *Wheaton*, 333; *Slaymaker vs. Gundacker*, 10 *S. & R.*, 75. The meaning of all this is, that the Bank in *some shape* furnishes the money to pay the note. When the new note takes the place of the old and cancels it, it is only a substitution of *this method for the actual payment* over the counter, and the immediate loan of the money again by a discount of the new note. It only dispenses with formality to carry out the intent of the parties. It is hard to perceive how the taking of the money and handing it back at once can make any difference in the transaction. The favor done by the Bank is the same in either case. In either case it is a renewal, if it is so intended. It is the intent of the parties and their understanding of it which makes it a renewal. 2 *Parsons on Bills and Notes*, 203 and 204. The word "renewal" has no legal or strictly technical signification. Whether a note is a renewal of another note, adjudged cases say depends entirely upon the intention of the parties. *Gault vs. McGrath*, 8 *Casey*, 397; *Russell vs. Phillips*, 68 *E. C. L.*, 900; *Hacker vs. Perkins*, 5 *Wharton*, 511.

The broad statement of the law, that "when a note is paid by funds not the proceeds of a new note discounted, the new note is not a renewal," as stated in the syllabus of Judge Lowrie's decision in *Hartley vs. Kirlin, et al.*, 45 *Penn.*, 49, on which the appellant rests her case, must be taken with some qualification, or else the very princi-

ple on which the doctrine of payment by renewal rests, will be uprooted, and the intention of parties respecting the transaction made of none effect. What Judge Lowrie said must be considered with reference to its application to the case before him, and the facts in the light of which he spoke. His very language shows that he did not intend it as a rule beyond that case. He says it cannot be so held "as in favor of the plaintiff who knew the mode in which the thing was done." In that case Hartley had a judgment by way of indemnity, from Kirlin & Co., which firm was composed of Kirlin, Godshall and Oakford, against certain notes he endorsed for the firm. Oakford withdrew from the firm, and the other partners continued the business under the same name. The new firm renewed with their note, and continued to do so: Each note in turn was paid before the new note was discounted. The Court below in charging the jury said, if Hartley knew there were new notes of *a new firm*, and not renewals of old debts of the firm, his knowledge would prevent his resorting to the estate of Oakford to recover on his *scire facias* on his indemnity judgment. And the Court above affirmed that judgment. The reason and propriety of the ruling is obvious. When the *new firm* paid the *old firm's* note, for which the new firm was liable, and Hartley held indemnity, and then obtained a discount on a *new note of their own*, the indebtedness of the *old firm* was extinguished, and an entirely new indebtedness was created upon which Oakford was not bound, and therefore Hartley knowing all this had no redress against him on his indemnity judgment for losses for his endorsements for the new firm. The plain inference from the ruling in that case is, that if there had been no change in the firm, the payment of the note and its immediately subsequent renewal would not have deprived it of its character as a renewal, so as to defeat Hartley's claim for indemnity against Oakford.

The case of *Hacker vs. Perkins* is analogous to this case. Peaslee, Seins & Co. were in difficulty. They were largely indebted to Hacker, Brown & Co. Hacker, Brown & Co. agreed to make advances for them, and to give them an extension of credit. The mode adopted was by a renewal of notes from time to time, in a way that would not disclose their difficulties, and would protect their credit. The Court in its opinion quotes the case as shown by the testimony, thus: "It was an extension of credit: The notes were renewed by taking to Hacker, Brown & Co. a new note, for the amount we wished renewed; *we paid on the note* falling due as much as we could; the new note and interest was for the balance, and was given to them, and they gave us a check for the amount of such new note. The check was taken to the Bank where Hacker, Brown & Co. kept their money, and we drew the amount, and with that and what we could pay, lifted the old note. The money was taken to the Bank where the plaintiffs kept their account, and not where we kept our account; we invariably took the money to the Bank where the notes were. The money was passed to the credit of the plaintiffs. The new note had nothing to do with the Bank transaction. I do not know that the Bank knew of the notes being renewed. The course is that the money is passed to the credit of the note in Bank. They were not out of pocket longer than to go from one Bank to another. The arrangement was that the notes should be renewed. There was no arrangement that they should lend us the money." It was held in this case that the transaction constituted renewals, and was not a new loan of money. The Judge said, " the result of all the cases in our own Court, and perhaps in all is, that it depends on the intention of parties; and if that can be ascertained, it decides whether it is or not an extinction of the old or the creation of a new debt." He cites 10 *S. & R.*, 82, and 15 *S. & R.*, 183. The same doctrine is maintained in

*Gault vs. McGrath, et al.*, 8 *Casey*, (32 *Pa.*,) 397, where
a mortgage was held to secure the renewals of a note to
secure which it was given. According to the doctrine of
these cases, we have no hesitation in deciding that the
transaction in this case was a renewal, so as to entitle the
Bank to the benefit of the collaterals deposited as security
for the first note. The renewal was applied for and
promised on the faith of the collaterals before the first
note fell due. It was not a new loan that was agreed
upon, but it was an extension of credit—a renewal that
was stipulated for. The debt was not in point of fact
paid, and was not intended to be *paid*, by what was done
respecting the note in Philadelphia. Payment is always
a question of intention. In *McIntyre vs. Miller*, 13 *Mee-
son & Welsby*, 726–727, it was held that the payment, by
one, of several joint obligors, of the obligation to the
obligee, and the having it assigned to a trustee for the
use of the obligor paying it, was not in fact payment;
because it was *not so intended*, and received. Chief Baron
POLLOCK said, to make it payment, "You must alter the
entire character of the transaction;" and Baron ALDER-
SON said, "Unless we are to make the acts operate the
exact reverse of what *was intended*, this is not payment."
All the Judges concurred.

In the case at bar it was not intended or understood
that the temporary taking up of the note from the
Philadelphia Bank, was to be a payment of the debt—
as to *that* extension was to be granted—a renewal was
pledged. The collaterals were already in hand, and to
be claimed for the purpose of securing the debt then exist-
ing and to continue. All that was required of the princi-
pal maker was to bring the note from the Philadelphia
Bank to the Easton Bank, and the Easton Bank would
discount for them again by way of renewal. The Bank
in Philadelphia was the agent of the Bank of Easton.
Payment then, therefore, would have the same, but no

greater effect than if it had been paid directly to the Easton Bank and had been handed immediately back, under the arrangement for renewal. If it had been done so, there would be no question about its being a renewal. The want of instantaneousness is the only difference. But under the agreement that makes no difficulty. They only had to arrange to carry the note for four days, and the money was returned to them. The Bank *had their collaterals,* and they had no doubt of the agreement being carried out, as it was to the letter. If the intention of parties in any case was ever perfectly established, it is in this. If that intention can control in any case, surely it will fix the character of this transaction. It does not lie in the mouth of this appellant to say it was not a renewal, or that these collaterals were not bound for the payment of this debt of her husband, James S. Flanagin. She had endorsed the bond and mortgage to him, and put him in possession of both for the purpose of raising money for his own uses, upon them. He had the power to sell. He could not sell as he desired, and, as her attorney in fact, he pledged these collaterals to secure the note he gave with the securities named, and which was discounted for him by the Easton National Bank.

Was he not warranted in doing what he did do? The bond was a *chose in action.* The mortgage was its mere incident—a security for its payment. The assignment of the bond for any purpose carried with it the incident, for the two are inseparable. His power over the bond, after its assignment to him by his wife, was absolute. He pledged it to the Bank as security for the note discounted for him. The note was renewed on the express understanding that the collaterals were to remain as security for the renewal also. He was all the while seeking a purchaser for the bond and mortgage who would take it as an investment. He was urging his counsel to find a purchaser, that he might sell, and with the proceeds take up

the note due the Bank, which had been successively re-dis-
counted.    If he had found a purchaser, and had taken up
the papers from the Bank, and had assigned them for-
mally to the purchaser, and with the proceeds had taken
up the note due the Bank, could there be any doubt that
the purchaser would have taken a good title to the *chose
in action* and the mortgage securing it?    Would not the
appellant be estopped?    It would be a fraud on the pur-
chaser, and she would not be allowed to deny her hus-
band's right to dispose of the note and mortgage.    By the
same rule, and for the same reasons the Bank is entitled
to the same protection.    From the time Mrs. Flanagin
endorsed the bond in blank and gave it and the mortgage
securing it, to her husband for him to dispose of, equity
must hold her bound by the legitimate consequences of
her act, and will permit no one to suffer who had a right
to suppose themselves protected in dealing with James S.
Flanagin about them.    If, therefore, he had the power to
bind her by the first deposit of the collaterals, and the
assignment of them in security for his indebtedness to
the Bank, even on the theory of the extinguishment of
the note, and the renewal being a new loan, the same
power to re-deposit for its security existed, and his agree-
ment touching them would bind her; so that it really
makes no difference as to result which view is taken of the
first point we considered.    The equity of the Bank's case
is especially apparent when it is remembered that during
all this time that the Bank held these collaterals, they
were so held without claim or complaint on the part of the
appellant—without any denial of her husband's right to
assign them to the Bank.    By her conduct, as we have
seen, she was affected with constructive knowledge of
what her husband had done ; but she had actual knowledge
also.    She knew the Bank held the collaterals and claimed
title to them.    The bill to sell the property set out that
the Bank claimed under them, and was entitled under

them. By her answer over her own signature she admitted the fact, and made no demur to its rightfulness. There was then but the one note, *the renewal,* in existence. She was a party to the suit and affected with notice of all that took place afterward. The proof disclosed the whole history of the transaction. Yet she never is heard to set up a claim until the auditor's report was made. Her conduct and admissions touching the matter conclude her from setting up any claim against the Bank which has been induced to lend its money on the faith of collaterals, she put it in the power of her husband to treat as his own, and confessedly to raise money on.

In no aspect of the case can we find any reason to differ with the learned Court who ratified the audit, which awarded the appellee the balance of the money in the trustee's hands.

*Order affirmed with costs,*
*and cause remanded.*

