FARMERS' LOAN & TRUST CO. v. CENTRAL PARK, N. & E. R. R. CO. et al.

(Circuit Court of Appeals, Second Circuit. December 15, 1911.)

No. 52.

1. STREET RAILROADS (§ 52*)—BONDS—PURCHASE OR PAYMENT—CONSTRUCTION OF LEASE—"RENEWAL OF BONDS."

Where a lease of street railway property, which was subject to a mortgage securing an issue of bonds, contained a provision requiring the lessee on the maturity of the debt to "provide for the renewal thereof by the issue or renewal of bonds," there was no duty on the lessee to pay and extinguish the bonds at maturity and its acquisition of them at or near their maturity, through a trustee, with the purpose of having them held by the trustee to protect its lease and its own bonds with the proceeds of which they were purchased and which were secured by a mortgage to the trustee on such lease and other property, did not operate as a payment but only as an extension which was fairly within the provision of the lease for a "renewal" (citing Words & Phrases, Title "Renewal").

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 52.*]

2. STREET RAILROADS (§ 54*)—MORTGAGE—EFFECT OF ASSUMPTION BY LESSEE.

Under the law of New York, the assumption by the lessee in a lease of street railroad property of a mortgage thereon did not impose on it any higher obligation than to hold the lessor harmless from the consequences of a foreclosure; the mortgaged property remaining the primary fund for payment of the mortgage.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 133; Dec. Dig. § 54.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by the Farmers' Loan & Trust Company, as trustee, against the Central Park, North & East River Railroad Company, the Metropolitan Street Railway Company, and others for foreclosure of a mortgage. From a decree of foreclosure (181 Fed. 595), the Central Park, North & East River Railroad Company, mortgagor, appeals. Affirmed.

William N. Dykman and Arthur E. Goddard, for appellant.

Geller, Rolston & Horan (Edward H. Blanc and Frederick Geller, of counsel), for appellee.

Bronson Winthrop (George Roberts, of counsel), for Morton Trust Company.

Before COXE and WARD, Circuit Judges, and HOUGH, District Judge.

HOUGH, District Judge. It is admitted that the opinion of Judge Lacombe, C. J., in the court below correctly states the material facts of this litigation. It is therefore unnecessary to consider at length the evidence and exhibits.

The propositions on which the Central Park Company rests its appeal are reducible to three, viz.:

(1) Since the lease of 1892 provides that "this lease is made subject to all debts and liabilities of the [Central Park Company] which are hereby assumed and are to be paid by the [Metropolitan Company] as a part of the consideration hereof," it follows that the Metropolitan Company became primarily responsible for the mortgage debt of 1872; the Central Park Company but a surety, and its property also but secondarily liable.

(2) This being the legal relation of the parties, the acquisition of the bonds on their maturity by the Morton Trust Company, under the circumstances, and in the manner detailed in the opinion below, constituted a payment of the mortgage debt.

(3) But, if the bonds were not extinguished by payment eo instanti, the Morton Trust Company acquired possession of them, then the time for their payment was extended in favor of Metropolitan Company by the terms of the mortgage of 1902, and such delay discharged the Central Park Company as surety, and its property as well.

This case does not require decision of the question whether the lease of 1892 imposed upon the Metropolitan Company the obligation of ultimately paying, not only the current indebtedness, but the already existing funded debt of the Central Park Company.

[1] It is enough that the document itself is sufficient evidence that the parties intended the indebtedness secured by the mortgage of 1872 to be continued, and the property of the Central Park Company to be pledged to secure the same, for an indefinite period. This is fully shown by the following language from the lease:

"Whenever any of the funded debt of the party of the first part [Central Park Company] shall become due and payable, the party of the first part shall, upon the request of the party of the second part provide for the re-

newal thereof by the issue or the *renewal* of bonds in the customary form and upon like request shall secure the same by mortgage or mortgages upon all its property and franchises, and this shall be done at the lowest rate of interest at which such bonds can be marketed.

"Provided, however, and it is hereby expressly agreed, that any mortgage so made shall be made subject to the existing first mortgage of one million two hundred thousand dollars ($1,200,000) now upon the property of the company, and also to the rents provided to be paid by this lease, which mortgage and rents shall be a charge upon all of the property and rights of the company prior to any other mortgage which may hereafter be placed thereon; it being understood that said first mortgage may be refunded at lower interest and still retain its place as first mortgage."

It follows from this that there was no duty upon the Metropolitan Company to pay and extinguish the Central Park Company's bonds in 1902, nor at any time down to the present. This being true, it would require a most technical view of the actual occurrences to produce the holding that what the lessee company was not presently bound to do, what no one intended to do, and what the lessor never asked to be done, was nevertheless inadvertently accomplished.

We agree with appellee's contention that what was done amounted to an extension of the bonds (or of the indebtedness evidenced by the same), without interest, and are of opinion that such extension is fairly within the provision of the lease for "renewal of bonds." See Words and Phrases, tit. "Renewal," for cases holding extensions frequently synonymous with renewals.

[2] But even assuming with appellant that the lease of 1892 does contain an assumption of the Central Park Company's funded debt, and assuming, further, this case is governed wholly by the law of New York as declared by its highest court, there is nothing in the evidence to show that the Metropolitan Company ever assumed any higher obligation than one to hold the Central Park Company harmless from the consequence of foreclosure, the pledged property remaining as always the primary fund for the payment of the mortgage. "The giving of a covenent by the grantee does not work a novation of the mortgage debt. It does not make the debt his own, except in respect to the estate." Matter of Wilbur v. Warren, 104 N. Y. 198, 10 N. E. 265, citing Butler v. Butler, 5 Ves. 534.

This is exactly where appellant's argument leads, viz.: The asserted assumption of payment is held to have worked a novation, so that an action would have lain by the Central Park Company against the Metropolitan Company in 1902 to compel the surrender and cancellation of the bonds in question, even though (had that been done) the same property might have been at once subjected to another mortgage of the same amount to run for any length of time. This position seems to us answered by its statement.

It follows, from the admission made (for argument's sake only) of an assumption of the debt secured by the mortgage of 1872, that the pledged property remained the primary fund for repayment, and that whatever extension of time for payment resulted from the terms of the mortgage of 1902 was granted not to the principal, but to

the surety (Metropolitan Company), and has not, therefore, worked any release of the principal fund now being proceeded against.

The decree is affirmed, with costs.

WARD, Circuit Judge (concurring). December 1, 1872, the Central Park, North & East River Railroad Company made its mortgage to the Farmers' Loan & Trust Company to secure payment of bonds aggregating $1,200,000 and maturing December 1, 1902.

October 14, 1892, the Central Park Company leased all its property to the Metropolitan Street Railway Company for the unexpired term of its charter, some 68 years, and for any extension thereof which under the law might be perpetual. The lessee assumed the payment of the mortgage debt. This resulted as between the parties in the Metropolitan Company becoming the principal debtor and the •Central Park Company and the mortgaged premises the surety.

February 14, 1902, the Metropolitan Company leased all its properties, including the Central Park leasehold, to the Interurban, now the New York City Railway Company, for the term of 999 years, the rent being payment of all taxes and assessments, all interest payable by the Metropolitan Company and a dividend of 7 per cent. on its capital stock. March 21, 1902, the Metropolitan Company executed a mortgage to the Morton Trust Company to take effect April 1, 1902, to secure the payment of $65,000,000 of 100-year refunding bonds of which it was intended to issue $23,950,000 in payment of, and substitution for, outstanding bonds to that amount secured upon properties owned by the company and $18,820,000 to be used to acquire bonds secured upon properties leased by the company, among which were these Central Park bonds. These acquired bonds were to be kept alive (the purpose being, of course, to make the refunding mortgage eventually a first lien), and were to be given to the Trust Company as additional security for the payment of the refunding bonds. When the Central Park bonds fell due, they were, in accordance with the provision of the mortgage, taken up with the moneys of the Metropolitan Company derived from the sale of the refunding bonds and delivered to the trustee as additional security for the payment of the refunding bonds. June 12, 1908, the Metropolitan and New York City Railway Companies having failed and the interest on the Central Park bonds held by the Morton Trust Company being in arrear, this proceeding was begun to foreclose the mortgage on the property of the Central Park Company. That company defends on the ground, first, that the bonds were paid, and, second, if not paid, that it was discharged for all liability in connection with them as surety by the dealings between the Metropolitan Company and the Morton Trust Company.

I have little difficulty in finding that the bonds were purchased and not paid as between the parties here involved. This was the scheme of the mortgage. They were delivered to the Morton Trust Company for that purpose, and were marked by it as held in trust for the purpose of the mortgage and the Central Park Company reported the bonds to the public authorities as outstanding and held in the in-

vestment account of the Metropolitan Company in the months of June, 1904, 1905, and 1906.

Though the mortgage debt was not technically refunded as provided in the lease, the arrangement by which it was kept alive accomplished the same purpose, and was acquiesced in by the parties. The question is whether the bonds were kept alive merely for the benefit of the Metropolitan Company as principal debtor or whether they were kept alive for the benefit of the Morton Trust Company, trustee of the refunding bonds.

It may be conceded that the Central Park Company did not know the provisions of the mortgage, and that knowledge of those provisions is not to be imputed to it. Upon this theory all we have a right to suppose that it knew is that the Metropolitan Company was keeping the bonds alive for its own purposes not inconsistent with its being the principal debtor.

If the Metropolitan Company, the owner of the bonds, were now the holder, it is quite clear that it could not foreclose because between it and the Central Park Company it is the principal debtor and the Central Park Company and the mortgaged premises surety. The theory that the land is the primary fund for the payment of a mortgage debt is true and equitable between grantor and grantee because the grantor has no interest whatever in the land and his liability as surety will be extinguished or reduced pro tanto by the sale of the land. This is not so between landlord and tenant. If the landlord's real estate is sold to pay the tenant's debt, the landlord's liability as surety is not thereby extinguished or diminished. On the contrary, he will be paying the debt exactly as if he were the principal debtor.

The Central Park bonds were negotiable securities. When the Morton Trust Company delivered the refunding bonds to the Metropolitan Company upon the distinct agreement that the Central Park bonds then delivered to it should be held as additional security, the Trust Company was not affected by equities existing in favor of the Central Park Company against the Metropolitan Company as to these bonds unless it had notice of them. No evidence of actual notice is offered and the question is whether it had constructive notice. It is sought to prove this by imputing to it as matter of law knowledge of the provisions of the lease from the Central Park Company to the Metropolitan Company of October 14, 1892, which, I think, may not be done.

I am not impressed by the argument made on one side or the other that the results pointed out from a certain construction of the documents are such as to make it impossible to believe that any sane person would have made such a contract. The draftsman was no doubt contemplating, as probably everybody in interest was contemplating, that this particular adventure would be a most profitable one and continue such say for a thousand years. It is its unexpected failure within a very few years that has raised these very embarrassing questions. If the results had been foreseen, no doubt they would have been covered in the instruments. As it is, great hardship will be done to some one, however the case is decided.