**CAMPBELL RIVER TIMBER CO., Limited, v. VIERHUS.**

No. 8259.

Circuit Court of Appeals, Ninth Circuit.

Nov. 30, 1936.

R. G. Wright, H. B. Jones, and R. E. Bronson, all of Seattle, Wash., for appellant.

Robert H. Jackson, Asst. Atty. Gen., J. Louis Monarch and Francis I. Howley, Sp. Assts. to Atty. Gen., and J. Charles Dennis, U. S. Atty., of Seattle, Wash., for appellee.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

GARRECHT, Circuit Judge.

The appellant sues to recover $1,213, assessed as a documentary stamp tax and collected by the appellee under Schedule A (1) of Title 8 of the Revenue Act of 1926, as amended by section 721 (a) of the Revenue Act of 1932, 26 U.S.C.A. §§ 900 and 901 and note; 44 Stat. 99 and 101, and 47 Stat. 272.

The pertinent provision of the 1926 act is as follows:

"Schedule A.—Stamp Taxes

"1. Bonds of indebtedness: On all bonds, debentures, or certificates of indebtedness issued by any corporation, and all instruments, however termed, issued by any corporation with interest coupons or in registered form, known generally as corporate securities, on each $100 of face value or fraction thereof, 5 cents: Provided, That every renewal of the foregoing shall be taxed as a new issue." (44 Stat. 101.)

The act of 1932 raises the rate to ten cents per hundred dollars. Otherwise the foregoing language remains the same.

The appellee's demurrer was sustained to a complaint containing the following allegations:

On January 2, 1927, the appellant authorized the issuance of a series of first mortgage bonds to a total of $3,000,000, to mature serially over the period from January, 1932, to January, 1941, inclusive, secured by a deed of trust covering timber lands and improvements running to the Detroit Trust Company, as trustee, Article XXX of the deed of trust provided that, upon certain specific notice, a meeting of bondholders might be called by the mortgagor, the trustee, or by any bondholder, at which a quorum should consist of 75 per cent. of the outstanding bonds, and that: "Any action or resolution approved in writing at any such meeting by the holders or owners of at least seventy-five per cent * * * of the bonds represented at such meeting and thereat or subsequently approved in writing by both Timber Company and Trustee, signed by their duly qualified officers, shall be suf-

ficient authority to Timber Company and/or Trustee to act in pursuance of such action or resolution whether same shall necessitate a change or changes or modification of any or all of the terms of this instrument or shall necessitate other action."

On November 27, 1933, there had been issued and were outstanding under such authorization bonds of the total principal amount of $1,382,000, of which $59,000 had matured on January 1, 1933, $169,000 were of the maturity of January 1, 1941, and the remainder matured in approximately equal amounts upon January 1 of the intervening years.

Prior to November 27, 1933, the appellant, being unable to meet such maturing obligations, had requested the calling of a bondholders' meeting under article XXX, supra. As a result of that meeting, a "Supplemental indenture of trust" was entered into as of November 27, 1933, between the appellant and the trustee. The instrument recited the approval of the necessary percentage of bondholders, and provided that:

"First. The maturity dates of all the bonds of this issue maturing prior to the year 1941, are by these presents hereby extended until January 1, 1941, so that all bonds of the issue hereinbefore described shall mature January 1, 1941, anything in said Indenture of Trust or in the bonds themselves contained to the contrary notwithstanding."

The text of the entire supplemental indenture, exclusive of acknowledgments and verifications, covers seventeen pages of the printed transcript. The appellant concedes that this supplemental indenture set forth "other new obligations undertaken relating to payment of interest, sinking fund, working capital," etc., but insists that "these were not the obligations upon which the tax here involved was imposed."

Upon being advised of these facts, the appellee assessed and collected a tax upon all the maturities prior to that of January 1, 1941, at the rate prescribed by law. At the time it paid the tax, the appellant filed a claim for refund, which, under date of March 30, 1935, was rejected upon the ground that: "It is clear that the provisions of the agreement effect an extension of the date of maturity of the bonds with respect to those bonds originally maturing on January 1, 1932, to January 1, 1940, and comes within the provisions of Article 9, of Regulations 71, which provides that an agreement extending the maturity of a mortgage bond operates as a renewal, and that such renewal is subject to tax."

From the lower court's judgment sustaining the appellee's demurrer to the complaint, the present appeal has been taken.

It is the appellant's position that the language and scope of the supplemental indenture constitute substantially nothing more than a postponement conditioned upon the performance of other terms to the satisfaction of the trustee; that at the most it is nothing more than an extension; that an extension is not synonymous with the statutory term "renewal"; and that article 9 of Regulations 71, relied upon by the Commissioner in denying the refund, does not and cannot apply to an extension.

In the first place, it should be observed that the supplemental indentures does more than merely extend the time of payment. Admittedly, in addition to such extension, the instrument provides, in the appellant's own language, "for the modification of the trust indenture in other respects not deemed material to the present controversy, and all conditioned upon the performance of certain requirements by the Timber Company [appellant] to the satisfaction of the Trustee."

As we shall see presently, modification of the original obligation as to matters other than the time of payment might be regarded not only as more than an extension, but even more than a renewal. Such modification could arguably be considered as effecting a new obligation, which clearly could be taxable.

Assuming, however, for the sake of the argument, that the supplemental indenture does indeed amount to an extension, we find respectable authority, including federal decisions, holding that the terms "extension" and "renewal" may be used interchangeably.

In Farmers' Loan & T. Co. v. Central Park, N. & E. R. R. Co. (C.C.A.2) 193 F. 963, 965, certiorari denied 225 U.S. 712, 32 S.Ct. 841, 56 L.Ed. 1268, the court said: "We agree with appellee's contention that what was done amounted to an extension of the bonds (or of the indebtedness evidenced by the same), without interest, and are of opinion that such extension is fairly within the provision of the lease for 'renewal of bonds.' See Words and Phrases, tit. 'Renewal,' for cases holding extensions frequently synonymous with renewals." See, also, McRoberts v. Spaulding (D.C.) 32 F.(2d) 315, 318.

In the well-considered case of Lowry Nat. Bank v. Fickett, 122 Ga. 489, 50 S.E. 396, 397, 398, there is found a scholarly exposition regarding the term "renewal" and its implications: "A renewal, in its broadest sense, means that which is made anew or re-established. In law it has been defined to be 'an obligation on which time of payment is *extended.*' English's Law.Dict. It has also been said that it is not a word of art, and has no legal or technical signification; has in one instance been defined to be the substitution of a new right or obligation for another of the same nature, and in another instance as a change of something old to something new. 24 Am. & Eng.Enc.L.(2d Ed.) 465. As applied to promissory notes, the term 'renewal' has been held to mean 'the re-establishment of the particular contract for another period of time.' Kedey v. Petty, 153 Ind. 179, 54 N.E. 798. It has also been held that there might be such a thing as a renewal where the party was different, provided the obligation was of the same nature; as in a case where a widow gave her note in lieu of the note of her deceased husband for the same amount. Sponhaur v. Malloy, 21 Ind.App. 287, 52 N.E. 245. It has also been said that whether a new note is a renewal of another note depends upon the intention of the parties. Flanagin v. Hambleton, [222] 54 Md. 227. Not only the definition of renewal, but also its application in the cases cited and in similar cases, carries the idea that an obligation is renewed when *the same obligation is carried forward by the new paper or undertaking, whatever it may be.* There may be a change of parties. There may be an increase of security, but there is no renewal unless the obligation is the same. *What makes the renewal is an extension of time in which to discharge the obligation. If the obligation changes, there can be no renewal, because there can be no such thing as the re-establishment of an old obligation by the creation of a new obligation different in character.*" (Italics our own.)

In Sproul v. Beskin, 179 App.Div. 275, 166 N.Y.S. 606, 608, a renewal was defined as "the continuance of the old obligation." Such a definition could assuredly apply equally to an "extension."

Finally, we are of the opinion that the case of Sheldon v. Mississippi Cottonseed Products Co. (C.C.A.5) 81 F.(2d) 169, 171, 172, certiorari denied 297 U.S. 721, 56 S.Ct. 599, 80 L.Ed. 1005, is directly in point. The law and the facts in that case were on all fours with those here presented. In view of the fact that the decision contains a convenient summary of the legislative and administrative history of the tax involved in the instant case, we quote from the opinion somewhat fully:

"The word 'renewal' has different meanings, varying with the subjects with reference to which it is used. One of the definitions of the word 'renew' found in Webster's New International Dictionary is: 'To grant or obtain extension of; to continue in force for a fresh period; as to renew a note or a bond.' As commonly used with reference to notes and bonds, the word 'renewal' imports a postponement of the maturity of the obligation dealt with, an extension of the time in which that obligation may be discharged. [Cases cited.] * * *

"It well may be inferred that, in enacting the above set out proviso, the lawmakers contemplated that that proviso would cover such a transaction as the one now in question. It cannot reasonably be supposed that it was intended that an issue of new bonds with interest coupons and maturing at later dates in lieu of previously outstanding similar bonds evidencing the same obligation as to principal and rate of interest would be subject to the tax, but that a change in the previously outstanding bonds by an indorsement thereon postponing the dates of the maturity thereof would not give rise to liability for that tax. Nothing in the language of the statute indicates a purpose to make liability for the tax imposed dependent upon form, rather than upon substance. To say the least, it appears that, consistently with well-recognized usage, a postponement of the maturity of corporate coupon bonds evidencing indebtedness may be described as a renewal of such bonds.

"The proviso in question is found in provisions of earlier statutes imposing stamp taxes on bonds and other instruments evidencing indebtedness. We understand that it first appeared in such a connection in section 800 et seq., Schedule A 1 of title 8 of the Revenue Act of 1917, 40 Stat. 300, 321. It was re-enacted without change four times, namely: In the Revenue Act of 1918, title 11, § 1100 et seq., Schedule A 1, 40 Stat. 1057, 1135; in the Revenue Act of 1921, title 11, § 1100 et seq., Schedule A 1, 42 Stat. 303; in the Revenue Act of 1924, title 8, § 800 et seq., Schedule A 1, 43 Stat. 333; and in the

Revenue Act of 1926. It appears that that proviso has been construed by officials charged with the enforcement of it as meaning postponement of the maturity of bonds referred to, and covering such a transaction as the one now in question, and that that construction has been impliedly approved by Congress. The following is article 8 of Treasury Regulations 71, relating to Stamp Taxes under title 8 of the Revenue Act of 1926, as amended by the Revenue Act of 1932: 'Art. 8. *Bonds renewed by agreement extending mortgage.*— An agreement extending a mortgage upon maturity where a bond is secured by the mortgage and such agreement operates to renew the bond, subjects the latter to stamp tax as a renewal.'

"The just set out Regulation was first issued in the same language as article 4 of Treasury Regulation 55 relating to stamp taxes under the Revenue Act of 1918, and has been carried forward into Regulations relating to stamp taxes under subsequent revenue acts, and is still in force. Even if the meaning of the proviso in question properly could be regarded as doubtful, great weight should be given to the construction of it by the department charged with its execution, and the repeated reenactment by Congress, without change, of the proviso which previously had received long-continued executive construction is an adoption by Congress of such construction." (Many cases cited.)

While conceding that the Sheldon Case "is very similar" to the present controversy, the appellant suggests that "there are some distinguishing features of importance in that the holders of 90 per cent. of the bonds, acting through a depository bank, appear to have been parties to the supplementary indenture and an indorsement was made on the bonds themselves by such depository that 'the maturity date of this bond is hereby extended five years.'" The appellant, however, does not press this point; and, indeed, a study of the record convinces one that there is no merit in the attempt to distinguish the Sheldon Case from the suit at bar. The supplemental indenture now before us recites that, "in accordance with the terms of said Article XXX [supra]," more than 75 per cent. of the bondholders represented at the meeting "voted affirmatively in favor of the adoption and approval of said plan and the granting of said requests, and the Trustee was thereat instructed to enter into a supplemental Indenture of Trust amending the original Indenture of Trust evidencing the changes in its terms and conditions necessitated by such adoption and approval and the granting of said requests."

As to the "endorsement * * * on the bonds themselves" referred to by the appellant herein, we might point out that article Sixth of the present supplemental indenture reads as follows: "Immediately upon the execution of this Supplemental Indenture by both parties, Trustee shall issue a call to all bondholders to present their bonds with all unpaid coupons attached, at the office of the Trustee, so that said bonds and the earlier coupons may be stamped with appropriate notice of the modifications evidenced hereby and additional coupons may be attached to bonds maturing prior to January 1st, 1941."

Surely the appellant will not contend that there is a legal difference between *stamping* a bond with a notice of modifications, and *indorsing* such notice upon the bonds!

Indeed, in its reply brief, the appellant concedes that it realizes that "the decision of Sheldon v. Mississippi Cottonseed Products Company places us at a considerable disadvantage."

We agree with the appellant in that view, and we find ourselves constrained to say that the appellant has failed to shake the persuasive effect of that decision.

Accordingly, both on reason and authority, we hold that the court below was correct in sustaining the appellee's demurrer and entering a judgment in his favor.

Judgment affirmed.

DENMAN, Circuit Judge, not participating.