# MORTGAGE GUARANTEE CO. v. ROGAN, Collector of Internal Revenue.
## No. 403-O'C Civil.

District Court, S. D. California, C. D.

Nov. 27, 1941.

C. S. Tinsman, of Fleming & Robbins, of Los Angeles, Cal., for plaintiff.

William Fleet Palmer, U. S. Atty., E. H. Mitchell, Asst. U. S. Atty., Armond M. Jewell, Asst. U. S. Atty., and Eugene Harpole, Sp. Atty., Bureau of Internal Revenue, all of Los Angeles, Cal., for defendant.

J. F. T. O'CONNOR, District Judge.

This is an action to recover $67,641.90 paid under protest to the defendant under the provisions of the Stamp Tax Act. The plaintiff is organized under Chapter VIII, Title II, Part IV of Division 1 of the Civil Code of the State of California, revised and amended in 1935 and set forth in sections 12420–12429 inclusive of the Insurance Code of the State of California, St.Cal. 1935, pp. 747 to 750. The plaintiff, pursuant to statutory authorization, made loans on real estate, which loans were evidenced by promissory notes secured by first liens upon the real property of the borrowers. These notes and encumbrances securing payment of same were deposited by plaintiff with depositaries and trustees under a Series of Mortgage Participation Declaration of Trust. The plaintiff also issued first mortgage assignments and policies of mortgage insurance.

The Legislature of the State of California passed an emergency statute effective May 15, 1933, Chapter 360 of the General Laws, St.Cal. 1933, p. 958. Section 453.11 provides that where the enforcement of a right secured by a mortgage or other lien shall be extended there shall be an extension for a like period of time of the date or dates upon which mortgage insurance companies are required to make payments under policies of mortgage insurance or mortgage participation certificates then issued and outstanding. Section 453.12 authorizes issuance of new certificates with consent of the Insurance Commission, and provides further that during the "emergency" the mortgage participation certificates or policies of mortgage insurance may be amended as to time of payment and other conditions, and shall become fully effective and binding upon all holders of such certificates outstanding when consented to in writing by the holders of 75% in interest of all certificates outstanding under such trust agreement. The statute fixed the emergency period as ending September 1, 1935, or prior thereto by an order of the Insurance Commission. Section 5 of the Act declares the "emergency" and the necessity for immediate preservation of the public peace, health and safety within the meaning of Section 1, Article IV of the Constitution of the State of California, and recites the economic crisis in the United States which had engendered financial disturbances and also recites the necessity for the legislation to protect home owners and other property owners in the state whose property is subject to encumbrances or mortgages in the form of deeds of trust, and to protect investors in mortgage participation certificates.

In December, 1933, plaintiff had in excess of $40,000,000 of first mortgage assignments and policies of mortgage insurance outstanding, and had foreclosed upon real estate securities totaling approximately.$12,000,000, while other securities not foreclosed were in default as to principal and interest. Between December 1, 1933, and October 1, 1934, and pursuant to the emergency statutes, plaintiff submitted to each holder of first mortgage assignments a plan for amending the existing declarations of trust, and providing for the payment date to be extended to November 1, 1938. The Insurance Commissioner of the State of

California approved the plan. More than 75% of the certificate holders of all of said trust series, with the exception of one series, executed said consents by October 1, 1934. Total face value of certificates outstanding October 1, 1934, was $36,-729,944. On December 21, 1936, Nat Rogan, Collector of Internal Revenue, demanded payment of $35,028.80, claiming such tax to be due under the provisions of the Stamp Tax Act, Schedule A-1, Title VIII of the Revenue Act of 1926, as amended by Section 721(a) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Code, § 1801, and on June 7, 1937, Nat Rogan, Collector of Internal Revenue, demanded additional tax of $1048.60. Payment was made by plaintiff under protest.

On August 12, 1937, plaintiff filed with said Nat Rogan, Collector of Internal Revenue, a claim for refund of the money for the taxes which was denied on November 30, 1937, by the Treasury Department.

The plaintiff sets up a second cause of action alleging further amendment of the existing trusts which principal amendment provided that the payment date of the certificates would not be prior to November 1, 1943. 75% of the certificate holders of the trust series consented in writing. This' amendment affected total face value certificates amounting to $31,564,500. On June 7, 1937, Nat Rogan, Collector of Internal Revenue, demanded a tax in the sum of $31,564.50 under the provisions of the Stamp Tax Act. The plaintiff paid said sum under protest. The authority for this extension is found in a moratorium act passed by the Legislature of the State of California effective September 15, 1934, page 1, Statutes 1935. This Act in part provided that property owners having property under foreclosure could petition the Superior Court of the county in which their property was located for postponement of sales under deeds of trust until February 1, 1935, if equitable grounds were found therefor, and making provision for the payment of taxes, insurance and for maintenance of the property and for payment of a reasonable rental value or portion of the income of the property to the creditor. Each session of the Legislature thereafter extended the provisions of the emergency act and sales were finally postponed until July 1, 1941. Plaintiff's foreclosure sales were postponed by the Superior Court of the State of California from time to time until July 1, 1939. The State Legislature enacted an insurance code, Statutes of 1935, Chapter 145, Chapter 2, sections 12420 to and including 12631 pertained to mortgage insurance companies. This Act became effective on September 15, 1935.

On August 12, 1937, plaintiff filed claim for refund. The claim was rejected by the Treasury Department.

"The Commissioner of Internal Revenue determined that the aforesaid alterations of the terms of plaintiff's corporate securities were subject to the tax imposed by Schedule A-1 of Title VIII of the Revenue Act of 1926, as amended by Section 721(a) of the Revenue Act of 1932. This provision of law reads in part as follows: 'Bonds of indebtedness: On all bonds, debentures, or certificates of indebtedness issued by any corporation, and all instruments, however termed, issued by any corporation with interest coupons or in registered form, known generally as corporate securities, on each $100 of face value or fraction thereof, 10 cents: Provided, That every renewal of the foregoing shall be taxed as a new issue: * * *' 26 U.S.C.A. Int.Rev.Code, § 1801.

"Article 9 of Regulations 71 provides: 'An agreement between the holder of a bond and the present owner of a parcel of real estate, extending maturity of a mortgage bond executed by a former owner, operates as a renewal and such renewal is subject to tax. If in addition a new bond is given for the same indebtedness, it also is subject to tax.'"

The plaintiff contends that the postponement of dates was accomplished by operation of law, and therefore should not be taxable as a renewal of securities within the contemplation of the Stamp Tax Act.

There can be no disagreement with plaintiff's contention that insurance companies are subject to state regulation and control and contracts with policy holders are subject to the police power of the state. Carpenter v. Pacific Mutual Life Ins. Co. of California, 10 Cal.2d 307, 74 P. 2d 761, affirmed by the Supreme Court of the United States on writ of certiorari, in the Matter of Neblett v. Carpenter, 305 U. S. 297, 59 S.Ct. 170, 83 L.Ed. 182. It is true the State has a vital interest in the liquidation and reorganization of such businesses. Mitchell v. Taylor, 3 Cal.2d 217, 43 P.2d 803. The interest of the State in insurance companies is discussed in Re German Alliance Insurance Co. v. Lewis,

233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189; also In re Globe & Rutgers Fire Insurance Co., 148 Misc. 497, 266 N.Y.S. 29, and National Surety Corp. v. Nantz, 262 Ky. 413, 90 S.W.2d 385. The enactment by the State Legislature of California of the Insurance Code, supra, was a reasonable exercise of the police power of the State. In Re People, by Van Schaick (Title & Mortgage Guarantee Co. of Buffalo), 264 N.Y. 69, 190 N.E. 153, 158, 96 A.L.R. 297, the Court said:

"The Legislature has, by other statutes recently adopted, changed the remedy of all holders of bonds and mortgages for the enforcement of their contractual rights. Resort even to the modified remedy may impose hardship on the debtor and injuriously affect the economic welfare of the state. The constitutional limitations upon the reserved power of the state preclude legislation which would entirely relieve a debtor from the hardship of compliance with an obligation voluntarily assumed. The owner of that obligation may, nevertheless, in his own interest, decide to postpone resort to legal remedy for its enforcement or may enter into an agreement for a change of that obligation, and it is common knowledge that investors often find it to their own interest to adopt such course. Choice of whether to forego or to avail himself of the remedies afforded by the law for the enforcement of a legal remedy is left by such statutes to the owner.

"The statute now under attack may properly be regarded as a supplement to these statutes. It affects only the holders of interests in contractual obligations which are held by more than one person, firm, or corporation and which are guaranteed by a guaranty corporation. Where more than one person has an interest in a contractual obligation, it is evident that there can be no voluntary agreement for change in the contractual obligations, unless all consent, and conversely there can be no enforcement of the contractual obligation except by a common agreement or by a person authorized to act in accordance with the terms of the original obligation or contract or by a person appointed in his stead. Ordinarily, the holder of certificates of an interest in guaranteed mortgages has no rights or duties in connection with the mortgage at least as long as the guaranty company is doing business and complies with its own undertakings. The guaranty company under its contract with the holder of the certificate may decide whether to foreclose or extend the mortgage, to waive or to resort to a remedy for any default. It assumes the risk of ultimate deficiency in payment of the indebtedness secured by the mortgage, and maintains control of the primary obligation. In effect, the mortgages underlying the certificates are regarded by the parties as security for the obligation of the guaranty company. When the guaranty company becomes insolvent or ceases to do business, a situation arises not provided for in its agreement with the holders of the certificates. When the guaranty becomes of doubtful value, the holders of the certificates must rely upon the mortgages for satisfaction of their claims, and, when the guaranty company ceases to conduct business, some other person or corporation must be substituted for it, authorized to administer or, at least, to enforce the mortgage investments in which all the certificate holders are interested. * * *

"The essential purpose of the statute is, however, to provide for the adoption of a plan for the permanent administration of the mortgage investments in which groups of investors are interested. All else is subsidiary. If the provisions for the adoption of such plan transcend the limitations of the legislative power, then the statute fails of its purpose. Each holder of a certificate is, under his contract, entitled to insist upon the enforcement of the bond, mortgages, and other security in which he has an interest and to a pro rata share of the moneys collected. Foreclosure at the present time may be beset by insurmountable obstacles, for there may be no money available to pay the expenses of necessary action. Foreclosure may destroy the investment of the other holders of certificates of the same series; for the property, at the present time, may, at a forced sale, bring no more than the amount of the tax liens. Foreclosure may ruin the owner of the equity of redemption. General foreclosure of the vast amounts of mortgages in which groups of certificate holders are interested might so demoralize the real estate market that the value of all mortgages would be diminished and the credit of insurance companies and savings banks destroyed. In spite of all this, the owner of a single certificate in a series has a contractual right to insist upon the enforcement of every contractual obligation

in which he is interested and to refuse to accede to any impairment of such obligation by agreement. The statute was intended to meet that situation. * * *

"The fairness of these provisions is evident. They do not give to a majority in interest, however large, the power to coerce another holder to accede to any plan of reorganization by the majority. They do not give the court power to coerce a single holder to accede to any plan of which the court approves. They do give the court authority, after a hearing, to approve a reorganization plan which is consented to by two-thirds in amount of those interested and to declare such plan effective.

"We may assume that, except for this statute, a certificate holder might stand upon his contractual rights and refuse to accede to any plan of reorganization of the rights of the holders of the mortgage investment, however advantageous the plan of reorganization might be. We may even assume that the Legislature could not pass a law which would compel a single holder to accede to such a plan, though approved by the court and consented to by a majority in amount of all the holders of interest in an investment, if only the rights of the parties to the contract were involved. Here, as we have said, much more is involved. Unreasonable insistence on contractual rights may work serious injury to the economic welfare of all the people. The statute must be judged in the light of that fact. Under conditions as they exist at present, the vital interests of the community call for legislation by which the investments of great numbers of people may be conserved and ruin averted. The Legislature has characterized the situation as a 'public emergency.' * * *

"Here the Legislature has not attempted to change the relative situation of debtors and creditors or provided that any obligation of a contract shall be impaired without the consent of two-thirds in amount of the holders of an interest in such obligations. Performance by the debtor according to the letter of the bond may be demanded unless holders in that amount consent to its postponement or alteration. * * *"

In United States v. Merchants National Bank 9 Cir., 101 F.2d 399, the court held:

"The transfer of legal title to the shares from the taxpayer corporation is wholly by operation of law within Regulations 71, Article 35(h).

"D. The transfer is not taxable because it is wholly by operation of law as in a transfer on the death of a testator effected by the law of the state when, through a will he had executed, the legal title to his shares is transferred to his executor.

"Article 35(q) of Treasury Regulations 71, here to be construed, exempts transfers by operation of law, 'without any voluntary act of the parties, such as transfer of stock from decedent to executor'". 101 F. 2d 399, at page 403.

The court cites both California and New York decisions holding that there is no tax where the transfer is by statutory operation. In Re Weil v. United States, D.C. S.D.N.Y. 1939, 30 F.Supp. 349, the Superintendent of Insurance took control of the institution until liquidation was ordered by the court. The facts are not similar to the instant case. In Campbell River Timber Company, Ltd., v. Vierhus, 9 Cir., 1936, 86 F.2d 673, 108 A.L.R. 763, the corporation found itself unable to meet its mortgage bonds and under Article 30 of the Trust Deed called a meeting of bond holders and obtained the necessary consent of the holders of 75% of the outstanding bonds to extend the maturity date. Recovery of the amount of the stamp tax paid by the corporation was denied by the court. The opinion cites cases holding that "extension" and "renewal" may be used interchangeably. Farmers' Loan & T. Co. v. Central Park, N. & E. R. R. Co., 2 Cir., 193 F. 963, 965, certiorari denied, 225 U.S. 712, 32 S.Ct. 841, 56 L.Ed. 1268. See also: McRoberts v. Spaulding, D.C., 32 F.2d 315, 318. And Lowry National Bank v. Fickett, 122 Ga. 489, 50 S.E. 396, 397, 398.

■ It is the opinion of the court that as to the 75% of the certificate holders who consented to the extension, it could not be said that such extension was by operation of law. Burke v. Backus, 1892, 51 Minn. 174, 53 N.W. 458, 459; Klauber v. San Diego Street Car Co., 1892, 95 Cal. 353, 30 P. 555; and United States v. Merchants National Bank, 9 Cir., 1936, 101 F.2d 399. The trust agreements and certificates as amended provided, in addition to the extension of maturity dates, that the plaintiff could, at its sole discretion, pay the installments on the principal with notes payable in ten years, in lieu of cash, and also lower the interest rate. These were entirely new conditions and new contrac-

tual obligations arose between the contracting parties.

Counsel are unable to find any opinion passing upon the question of documentary tax liability against the nonconsenting bond holders. This group of 25% or less are compelled, under the statute, to wait for a considerable period of time beyond the original due date for their interest and principal. They may suffer great inconvenience and financial loss, but in all probability not so great as foreclosure would inflict upon the owners of the real estate which secured the obligations they hold. It is clear that the 25% or less who did not consent to the extension of the due date and the other changes in the terms of the original obligations were, by operation of law, bound by the action of the 75%.

The parties to this action stipulated that after the approval of the proposed plan of amendment by the Insurance Commissioner of the State of California, the Mortgage Guarantee Company sent a copy of the proposed plan to the holders of certificates, by mail, enclosing copy of consent form, and upon the return of the consent forms signed, they were delivered to the Title Insurance and Trust Company as depositary and trustee. If 75% in any series did not consent, a representative of the plaintiff personally called upon the certificate holders. "No solicitation for additional consents was made after at least 75% had been obtained, although a few were received by mail or delivery after the trusts were declared amended by the Trustee." (Stipulation)

It was optional with the plaintiff to secure an extension of its obligations, and it was optional with 75% of the certificate holders to consent to such extension; therefore, it cannot be said that such extension or renewal was "wholly by operation of law"—hence, not controlled by United States v. Merchants National Bank, supra, and the other cases cited in this opinion. All certificates which were renewed, or the due dates of which were extended, were subject to the documentary tax.

It is clear that the Commissioner of Internal Revenue properly insisted that the documentary stamps be attached to the extension agreements under authority of Schedule A-1, Title VIII, Revenue Act of 1926, as amended by 721(a), Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Code, § 1801.

National Commercial Title & Guaranty Co. v. Kelly, D. C., 39 F.Supp. 339.

Judgment will be entered for the defendant, and findings will be prepared and submitted in accordance with the rules by the defendant.